Opinion
 

 LOW, J.
 
 *
 

 We must determine whether the Fair Political Practices Commission (FPPC) validly interpreted the California Government Code
 
 *436
 
 section 87103 phrase “public generally” so as to continue to allow members of an industry to serve on state decision-making boards affecting their industry. We conclude that the FPPC’s interpretation of “public generally” is consistent with the Political Reform Act (PRA).
 

 Plaintiffs Consumers Union of United States, Inc., California Citizen Action Group, and Disabled and Blind Action Committee of California, filed a complaint on May 5, 1976, alleging three causes of action against the FPPC, the Californiá Milk Producers Advisory Board (hereafter Board) and individual members of both agencies. One cause of action sought a peremptory writ of mandate to compel the FPPC to enforce conflict of interest section 87103.
 
 [1]
 
 The complaint alleged that California Administrative Code, title 2, section 18703, subdivisions (c) and (d), conflicted with section 87103. The trial court agreed with plaintiffs and issued a peremptory writ of mandate ordering the FPPC to vacate the regulation. Judgment was entered and this appeal followed.
 

 We first must determine whether an appeal lies. Where there are several causes of action relating to different parties, separate judgments may be entered, giving rise to separate appeals.
 
 (Aetna Cas. etc. Co.
 
 v.
 
 Pacific Gas & Elec. Co.
 
 (1953) 41 Cal.2d 785 [264 P.2d 5, 41 A.L.R.2d 1037]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 48, pp. 4062-4064.) In the instant case, a final determination has been made of the rights of one party and that party need not wait until final judgment has been entered against the other parties. (6 Witkin,
 
 op. cit. supra,
 
 § 42, p. 4057.) The order granting the writ of mandate is appealable. (Code Civ. Proc., §§ 1110, 1064, 904.1;
 
 Ross
 
 v.
 
 Municipal Court
 
 (1975) 49 Cal.App.3d 575, 576 [122 Cal.Rptr. 807].)
 

 The Political Reform Act of 1974 (commonly known as Prop. 9) was an initiative measure adopted by the electors on June 4, 1974, which became effective January 7, 1975, establishing the FPPC, and charging it with primary responsibility for the impartial, effective administration and implementation of the act. (§83111.)
 

 Section'87103
 
 [2]
 
 provides that a public official (defined in § 82048) has a financial interest in a governmental decision “if it is reasonably forsee
 
 *437
 
 able that the decision will have a material financial effect, distinguishable from its effect on the public generally,” on certain defined interests of the official. The challenged regulation (Cal. Admin. Code, tit. 2, § 18703, subds. (c) and (d)) interprets the phrase “the public generally” to mean “all members of the public or a significant segment of the
 
 [3]
 
 A
 
 *438
 
 significant segment of the public is further defined to include a trade, industry or profession, if an agency is required or expressly authorized by law to draw its members from that particular trade, industry or profession. The regulation thus allows industry board members to participate in governmental decisions that affect their financial interests if such decisions would similarly affect others in the same industry, trade or profession. Board members must, however, disqualify themselves from participating in decisions that affect their own interests in a manner different from the interests of other members of the industry. An FPPC survey concluded that approximately 92 state boards, as well as numerous local boards, would be affected in varying degrees by the regulation.
 

 Subdivision (d) of the regulation gives the Legislature and local lawmaking bodies an opportunity to examine each board to determine if continued industry representation is consistent with the public interest. If, by January 1, 1979, the legislative body has not made an express finding or declaration that industry representation on a board serves the public interest, the FPPC will determine how the phrase “public generally” should be applied on a case by case basis.
 

 The Legislature responded to subdivision (d) of the regulation (promulgated in February 1976 and approved and filed on Sept. 30, 1976) by unanimously passing such bills as Assembly Bill No. 3277 (1975-1976 Reg. Sess.). Assembly Bill No. 3277 added section 58852 to the California Marketing Act of 1937 in the Food and Agricultural Code and states: “It is hereby declared, as a matter of legislative determination, that the producers, or handlers, or both producers and handlers, appointed to any advisory board pursuant to this article are intended to represent and further the interest of a particular agricultural industry concerned, and that such representation and furtherance is intended to serve the public interest. Accordingly, the Legislature finds that, with respect to persons who are appointed to such advisory boards, the particular agricultural industry concerned is tantamount to, and constitutes, the public generally within the meaning of Section 87103 of the Government Code.” Subsequently, the Legislature passed 21 other statutes responding to the
 
 [4]
 

 
 *439
 
 We must determine the intent and purpose of the PRA, i.e., whether the FPPC acted in accordance with the mandate of the voters. Our function is to ascertain the legality of the regulation, not its wisdom. The regulation must interpret, make specific or otherwise advance the provisions of the act; the regulation is not valid unless consistent with the act.
 

 There has been much argument by all parties concerning the voters’ intent in enacting Proposition 9. The act’s legislative history is also extensively discussed in an effort to determine legislative intent. As much of this discussion, however, has been from jaundiced partisan eyes, it would be folly to attempt an analysis of what the majority of the voters had in mind in adopting the PRA, especially since we cannot legitimately assume that voters possessed any uniform intention or thought. Because voters were asked to appraise numerous sections of technical, foggy language in Proposition 9, to attempt to fathom the electors’ intentions is pregnant with danger.
 
 [5]
 

 To determine the intent and purpose of the PRA, it would be helpful to review some of the conflict of interest legislation immediately prior to Proposition 9’s enactment. Preceding the PRA by nearly five years, the 1969 financial disclosure law (former §§ 3600-3704) was declared unconstitutional as an intrusion into the right of privacy of persons seeking public office.
 
 (City of Carmel-By-The-Sea
 
 v.
 
 Young
 
 (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].) The 1969 act required financial disclosure if the official had any financial interests that exceeded $10,000. There was no differentiation as to types or categories of public officials and the act went so far as to include career executive civil servants (see § 3605 of the act in appen. to the opn. at p. 274).
 
 Carmel-By-The-Sea
 
 states that the valid state purpose of preventing conflicts of interest can be achieved by a law more narrowly drawn. Disclosure requirements must be relevant to the duties of the affected officials. “Nothing we say here should be deemed to preclude the Legislature in a properly drawn statute from providing for a broad disclosure of assets, income or receipts relevant to the duties and functions of a public officer or employee. [1] We are satisfied that in light
 
 *440
 
 of the principles applicable to the constitutional rights here involved, no overriding necessity has been established which would justify sustaining a statute having the broad sweep of the one now before us, which, as stated, would intrude alike into the relevant and the irrelevant private financial affairs of the numerous public officials and employees covered by the statute and is not limited to only such holdings as might be affected by the duties or functions of a particular public office. As in
 
 Huntley
 
 v.
 
 Public Utilities Com., supra, 69
 
 Cal.2d 67 [69 Cal.Rptr. 605, 442 P.2d 685], the disclosure requirement reaches beyond any legitimate state interest. Furthermore, the price which the state and the local agencies of government would be expected to pay, should the constitutionality of such a statute be sustained, in the exodus of competent officials from public office and the dispiriting effect on the willingness of other competent citizens to take on the burdens of public office, far outweighs any legitimate public interest to be served.”
 
 (Id,
 
 at p. 272.)
 

 The Legislature responded to the court’s invitation to draft a more narrowly worded statute. In October 1973, it passed the popularly titled “Moscone Act” which became effective January 1, 1974. (§§ 3600-3760, Stats. 1973, ch. 1166, in effect until a conflict of interest code is adopted pursuant to § 87300.) The Moscone Act was held to be constitutional in
 
 County of Nevada
 
 v.
 
 MacMillen
 
 (1974) 11 Cal.3d 662 [114 Cal.Rptr. 345, 522 P.2d 1345]. The act contains both prohibitions (§§ 3625-3627) and disclosure (§§ 3700-3710) provisions summarized in the
 
 Nevada County
 
 opinion at pages 667-670. The court states at page 671: “On the other hand, the 1973 act appears to accomplish its legitimate aims in a less intrusive, and considerably more limited, fashion. As noted above, the act’s ‘prohibition’ provisions are keyed at enjoining only ‘substantial’ conflicts of interest (§ 3625, subd. (a)) and relate only to public agency action or decision having a ‘material economic effect’
 
 (id.,
 
 subd. (c)) upon the official’s economic interests. Thus, the act does not forbid an official to participate in agency matters which could have only an insignificant, de minimis economic effect upon his interests. More importantly, the act’s ‘disclosure’ provisions are aimed at requiring disclosure only if the official’s interests could be ‘affected materially’ by his public service. (§ 3700, subd. (c).)”
 

 Section 3625, subdivision (d) of the Moscone Act contained an industry board exception similar to the one found in regulation 18703.
 
 [6]
 
 This
 
 *441
 
 exception appeared in the legislation when it was first introduced on April 11, 1973 (Sen. Bill No. 716, 1973 Reg. Sess.). The significant changes in the conflict of interest provisions from the date of its introduction to its adoption on October 2, 1973, concerned the expanded scope of public officials required to disclose financial interests. As introduced, every public official (broadly defined in § 3610, subd. (h) to include appointive officers of the executive, legislative or judicial branches, as well as elective state and local officers) was required to file a statement of all financial interests which could be materially affected by official action. As enacted, the term “public official” was greatly restricted and only applied to elective or appointive officers. Local agencies were given the discretion to adopt guidelines for disclosure regarding other officials (§ 3625 and § 3610, subd. (h)).
 

 The purposes of the conflict of interest provisions of the PRA of 1974 are partially set forth in section 81001, which states these findings:
 

 “The people find and declare as follows:
 

 “(a) State and local government should serve the needs and respond to the wishes of all citizens equally, without regard to their wealth;
 

 “(b) Public officials, whether elected or appointed, should perform their duties in an impartial manner, free from bias caused by their own financial interests or the financial interests of persons who have supported them;
 

 “(c) Costs of conducting election campaigns have increased greatly in recent years, and candidates have been forced to finance their campaigns by seeking large contributions from lobbyists and organizations who thereby gain disproportionate influence over governmental decisions;
 

 “(d) The influence of large campaign contributors is increased because existing laws for disclosure of campaign receipts and expenditures have proved to be inadequate;
 

 “(e) Lobbyists often make their contributions to incumbents who cannot be effectively challenged because of election laws and abusive practices which give the incumbent an unfair advantage;
 

 
 *442
 
 “(f) The wealthy individuals and organizations which make large campaign contributions frequently extend their influence by employing lobbyists and spending large amounts to influence legislative and administrative actions;
 

 “(g) The influence of large campaign contributors in ballot measure elections is increased because the ballot pamphlet mailed to the voters by the state is difficult to read and almost impossible for a layman to understand; and
 

 “(h) Previous laws regulating political practices have suffered from inadequate enforcement by state and local authorities.”
 

 Section 81002 declares the legislative intent:
 

 “The people enact this title to accomplish the following purposes:
 

 “(a) Receipts and expenditures in election campaigns should be fully and truthfully disclosed in order that the voters may be fully informed and improper practices may be inhibited;
 

 “(b) The amounts that may be expended in statewide elections should be limited in order that the importance of money in such elections may be reduced;
 

 “(c) The activities of lobbyists should be regulated and their finances disclosed in order that improper influences will not be directed at public officials;
 

 “(d) Assets and income of public officials which may be materially affected by their official actions should be disclosed and in appropriate circumstances the officials should be disqualified from acting in order that conflicts of interest may be avoided;
 

 “(e) The state ballot pamphlet should be converted into a useful document so that voters will not be entirely dependent on paid advertising for information regarding state measure;
 

 “(f) Laws and practices unfairly favoring incumbents should be abolished in order that elections may be conducted more fairly; and
 

 
 *443
 
 “(g) Adequate enforcement mechanisms should be provided to public officials and private citizens in order that this title will be vigorously enforced.”
 

 The act seeks to protect all citizens from those who might govern in a financially self-interested manner. Public officials should perform their duties in an impartial manner free from the pressures and bias caused by their own financial interests. (§ 81001, subds. (a) and (b).) To implement those goals, the assets and income of public officials which may be materially affected by their official actions must be disclosed. In appropriate circumstances the officials should be disqualified to avoid conflicts of interest. (§ 81002, subd. (d).) To this end the PRA should be liberally construed to accomplish its purposes. (§ 81003.) The PRA seeks to bring a degree of credibility to government by providing that those who hold a public trust must act, and appear to act, ethically. Erosion of confidence in public officials is detrimental to democracy. The election and appointment of ethical public officials depends upon an informed, interested and involved electorate. To maintain confidence and to avoid public skepticism, conflicts of interest must be shunned. Moreover, the electorate, consisting of persons from a diversity of interests and goals, should be committed to participate in government, for democracy requires them to share their talents by serving on various boards, commissions and offices.
 
 (City of Carmel-By-The-Sea
 
 v.
 
 Young, supra,
 
 2 Cal.3d at p. 272;
 
 County of Nevada
 
 v.
 
 MacMillen, supra,
 
 11 Cal.3d at p. 671.) The PRA has the objective of making significant reforms in order that government serve the needs of all citizens equally and that public officials serve impartially. The act is not so overly broad as to destroy participatory democracy by those with limited, immaterial financial interests in their official actions, yet in certain circumstances officials are disqualified from serving in order to avoid conflicts of interest.
 

 The conflicts of interest chapter (§§ 87100-87312) is divided into three articles: General Prohibition (§§ 87100-87103), Disclosure (§§ 87200-87208), and Conflict of Interest Code (§§ 87300-87312). Section 87100 states the public policy concerning conflicts of interest and provides: “No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest.” Section 87103 outlines the four conditions which must exist where an official must disqualify himself from participating in a governmental decision: (1) The official must have
 
 *444
 
 a financial interest of the type described in section 87103, subdivisions (a)-(d); (2) the effect of the governmental decision on the official’s financial interest must be reasonably foreseeable; (3) the foreseeable effect of the governmental decision on the official interest must be material; and (4) the foreseeable effect of the governmental decision on the official’s financial interest must be distinguishable from its effect on the public generally. Not all public officials who have a financial interest are barred from participating in a governmental decision. Rather, enumerated preconditions must exist.
 

 There are no specific definitions in the PRA of the phrases “distinguishable from the public generally,” “reasonably foreseeable,” or “material financial effect.” The definitions of these phrases may have to be resolved through further litigation.
 
 (Metropolitan Water Dist.
 
 v.
 
 Fair Political Practices Com.
 
 (1977) 73 Cal.App.3d 650, 658 [141 Cal.Rptr. 8] [hg. den., Dec. 28, 1977].) The literal language of section 87103 is capable of the broad construction urged by the respondents. Some of the 1974 supporters of the PRA, no doubt, had hoped to make major revisions in the way government was to be run. Strong policy arguments may be made as to the desirability of eliminating, or severly restricting, industry members from boards, despite the claim that industiy boards promote higher standards for the industry and thus serve the public. There are meritorious arguments that many industry-dominated boards do not adequately serve consumers’ interests.
 

 The FPPC correctly notes that there is no clear meaning as to the scope and intent of section 87103. It therefore adopted a regulation which attempted to harmonize the act with prior legislation concerning industry boards. The respondents say that the regulation is inconsistent with the very language and scope of the act and is an attempt to undo by regulation what the voters thought they had enacted by initiative in 1974. The fundamental question is whether the PRA should be read to nullify the many state and local laws establishing regulatory boards and commissions whose members are drawn from the very industry, trade or profession regulated. We do not believe the act intended to do this.
 

 The Consumers Union refers to the People’s Lobby pamphlet circulated among the voters and cites the following language which asserts that the Moscone Act “. . . was so weakened by amendments that it covers less than half of the public officials covered by Proposition 9.” (Proposition 9, The Political Reform Act, A Fact for California, A Proposal for
 
 *445
 
 America (People’s Lobby, 1974) p. 67.) They argue that the statement refers to section 87103 because the Moscone Act contained the industry board exception, but Proposition 9 did not. Since the proposition was silent, respondents argue that the drafters deliberately refused to adopt the industry board exception. The exception, however, was not an amendment to the Moscone Act, but appeared when the bill was introduced on April 11. No statement in the pamphlet can be found which states that Proposition 9 would have the effect on section 87103 that is claimed by the respondents. A reasonable explanation is that the drafters of the Political Reform Act simply overlooked the problem. The relationship of the language of the initiative to the legislative history surrounding the Moscone Act is speculative at best.
 
 (Cooper
 
 v.
 
 Swoap
 
 (1974) 11 Cal.3d 856 [115 Cal.Rptr. 1, 524 P.2d 97] [cert. den., 419 U.S. 1022 (42 L.Ed.2d 296, 95 S.Ct. 498)].)
 

 We look to other guidelines in interpreting the statute.
 
 [7]
 
 There is a well settled “rule” against repeal of a preexisting law by implication.
 
 (Warne
 
 v.
 
 Harkness
 
 (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377];
 
 Sullivan
 
 v.
 
 Superior Court
 
 (1972) 29 Cal.App.3d 64, 72-74 [105 Cal.Rptr. 241];
 
 Sacramento Newspaper Guild
 
 v.
 
 Sacramento County Bd. of Suprs.
 
 (1968) 263 Cal.App.2d 41, 54-55 [69 Cal.Rptr. 480].) On the other hand, cases can be found which state that when two statutes conflict, the last one to be enacted, if specific, prevails.
 
 (County of Placer
 
 v.
 
 Aetna Cas. etc. Co.
 
 (1958) 50 Cal.2d 182, 189 [323 P.2d 753];
 
 McGriff v. County of Los Angeles
 
 (1973) 33 Cal.App.3d 394, 399 [109 Cal.Rptr. 186].) Furthermore, the Political Reform Act in section 81013 directs that if any act of the Legislature conflicts with its provisions, the act shall prevail. In
 
 Warne
 
 v.
 
 Harkness,
 
 the court was faced with the problem of whether the pledge and priority provisions of later enacted legislation, the Bums-Porter Act (Wat. Code, § 12930 et seq.) repealed authority to issue proposed bonds under an earlier act, the Central Valley Project Act (Wat. Code, § 11100 et seq.). The court stated: “[I]t is settled that there is a presumption against repeal by implication, that to overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent as to prevent their concurrent operation, and that the courts are bound to maintain the integrity of both statutes if they may stand together.” (60
 
 *446
 
 Cal.2d at p. 588.) That court also expressly refused to become involved in policy choices. On the other hand, there is case law which permits the court to effect. the purposes of an act, even though it may not be consistent with the strict letter of the statute.
 
 (Friends of Mammoth
 
 v.
 
 Board of Supervisors
 
 (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049];
 
 In re Haines
 
 (1925) 195 Cal. 605, 613 [234 P. 883].)
 

 Another “rule of construction” is that where the same subject matter is covered by inconsistent provisions, one of which is special and the other general, the special one, whether or not enacted first, is an exception to the general statute and controls unless an intent to the contrary clearly appears.
 
 (In re Williamson
 
 (1954) 43 Cal.2d 651, 654 [276 P.2d 593]; Code Civ. Proc., § 1859.) It can be soundly argued that the prior code provisions authorizing industry and special boards are more specific statutes than the subsequent Political Reform Act.
 
 (American Friends Service Committee
 
 v.
 
 Procunier
 
 (1973) 33 Cal.App.3d 252, 263 [109 Cal.Rptr. 22].)
 

 Still another “rule of construction” calls for the harmonizing of statutory provisions, if possible.
 
 (Fuentes
 
 v.
 
 Workers’ Comp. Appeals Bd.
 
 (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) The
 
 Fuentes
 
 case states: “Repeals by implication are not favored, and are recognized only when there is no rational basis for harmonizing two potentially conflicting laws.
 
 (In re White
 
 (1969) 1 Cal.3d 207, 212 . . . .) Furthermore, we must assume that when passing a statute the Legislature is aware of existing related laws and intends to maintain a consistent body of rules.
 
 (Estate of Simpson
 
 (1954) 43 Cal.2d 594, 600 . . .;
 
 American Friends Service Committee
 
 v.
 
 Procunier
 
 (1973) 33 Cal.App.3d 252 . . . .) In
 
 Theodor
 
 v.
 
 Superior Court
 
 (1972) 8 Cal.3d 77, 92 ... , we spoke ' . . of the policy that it should not “be presumed that the Legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication.” ’ ”
 
 (Id.,
 
 at p. 7.) Section 87103 could be potentially in conflict with many state laws and local ordinances and could create considerable difficulty for those agencies required by law to draw their members from the regulated trades or professions.
 

 Another “principle of statutory construction” accords “ ‘great weight’ ” to administrative interpretations unless they are clearly erroneous or unauthorized.
 
 (Wilkinson
 
 v.
 
 Workers’ Comp. Appeals Bd.
 
 (1977) 19 Cal.3d 491, 501 [138 Cal.Rptr. 696, 564 P.2d 848].) The FPPC is vested with
 
 *447
 
 primary responsibility for the impartial, effective administration of the act. Section 83112 authorizes the agency to adopt, amend and rescind rules and regulations to carry out the purposes and provisions of the act. The FPPC’s regulations are deemed valid so long as they are “consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute.” (§ 11374.)
 

 In response to the administrative regulation, the Legislature has determined that industry representation is consistent with the act in a number of specific situations. Twenty-one statutes have been enacted codifying a legislative determination that members of certain boards represent the public interest. (See fn. 4.) Accordingly, the statutes declare that a particular industry “is tantamount to and constitutes the public generally within the meaning of Section 87103. . . .”
 
 [8]
 
 (Cal. Admin. Code, tit. 2, § 18703.) These statutes are valid only if the FPPC’s regulation 18703 is valid. That is because these statutes purport to interpret provisions of the Political Reform Act, but they do not meet the statutory requirements for an amendment to the act. The Legislature may amend the act only if three conditions are met: (1) the amendment must “further [the] purposes” of the act; (2) the amendment must receive a two-thirds vote in each house of the Legislature; and (3) at least twenty days prior to passage, the bill containing the amendment must be delivered in its final form to the FPPC for distribution to the public. (§ 81012, subd. (a).) The fact that the Legislature and the Governor have acted in accord with the FPPC regulation indicates agreement with the FPPC’s solution to the potential conflicting laws and ordinances. Legislative findings as to public purpose, even after the relevant times, are not binding on the courts, but are given great weight and will be upheld unless they are found to be unreasonable and arbitrary.
 
 (California Housing Finance Agency
 
 v.
 
 Elliott
 
 (1976) 17 Cal.3d 575, 583 [131 Cal.Rptr. 361, 551 P.2d 1193].)
 

 The parties urge this court to consider statements made by parties who testified in the public hearings held prior to adoption of the regulation. At least six separate public meetings were held at which numerous parties testified. Supporters of industry-dominated boards and commissions pointed out that state and local governments frequently have deliberately delegated official decision-making responsibilities to persons who have an
 
 *448
 
 economic stake, direct or indirect, in the decisions to be made. Opponents of industry-dominated boards and commissions argued that such boards promote and protect industry interests at the expense of consumers. The Supreme Court in
 
 Friends of Mammoth
 
 v.
 
 Board of Supervisors, supra,
 
 8 Cal.3d at page 258, warned against use of contradictory reports by legislators. “That two legislators report contradictory legislative intent fortifies judicial reticence to rely on statements made by individual members of the Legislature as an expression of the intent of the entire body.”
 

 When canons of interpretation offer contradictoiy guidelines, we again look to the act. Reviewing the entire act in the light of recent conflict of interest legislation and related cases, section 87103 did not intend to abrogate those boards and commissions whose members are drawn from the same industry, trade or profession they affect. The regulation provides a valid definition of “public generally.”
 

 Merely because a board member derives income from within a given industry, he or she does not lose the ability to be objective. Nor does that person lose the capacity to make decisions beneficial to the public’s interest. The public interest emerges from the competing interests of various groups in our society, including those from a given industry. The act does not disallow that board member, who has a knowledge and a comprehension of how the industry interacts with society, from participating in governmental decisions which affect that industry.
 

 The members of the Milk Advisory Board are still required to comply with the conflict of interest laws. All potential conflicts must be disclosed without regard to the effect on the public generally.
 
 (Metropolitan Water Dist.
 
 v.
 
 Fair Political Practices Com., supra,
 
 73 Cal.App.3d 650.) Board members must file periodic statements disclosing their income, investments and assets. (§ 87302.) The Board must adopt a conflict of interest code. (§ 87300.) A Board member must disqualify himself from participating when it is reasonably foreseeable that the decision will have a material effect on his financial interest, distinguishable from the effect on the public generally as defined in regulation 18703.
 

 Finally we review subdivision (d) of section 18703. It provides that if, after January 1, 1979, the relevant legislative body has not made an express finding or declaration that industry representation serves the public interest, the FPPC will undertake that determination on a
 
 *449
 
 case-by-case basis. The state Legislature has acted pursuant to section 18703, subdivision (c) with respect to the Milk Producers Advisory Board by enacting Food and Agricultural Code section 58852. We need not consider subdivision (d) further and we do not otherwise express an opinion as to its validity or effect after January 1, 1979.
 

 Regulation 18703, subdivisions (c) and (d) are valid and the trial court is ordered to enter judgment consistent with the views expressed herein. Judgment reversed.
 

 Racanelli, P. J., and Elkington, J., concurred.
 

 Respondents’ petition for a hearing by the Supreme Court was denied September 20, 1978. Bird, C. J., did not participate therein.
 

 *
 

 Assigned by the Chairperson of the Judicial Council.
 

 [1]
 

 All section references are to the Government Code unless otherwise stated.
 

 [2]
 

 Section 87103 provides:
 

 “An official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect,
 
 *437
 
 distinguishable from its effect on the public generally, on:
 

 “(a) Any business entity in which the public official has a direct or indirect investment worth more than one thousand dollars ($1,000);
 

 “(b) Any real property in which the public official has a direct or indirect interest worth more than one thousand dollars ($1,000);
 

 “(c) Any source of income, other than loans by a commercial lending institution in the regular course of business, aggregating two hundred fifty dollars ($250) or more in value received by or promised to the public official within twelve months prior to the time when the decision is made; or
 

 “(d) Any business entity in which the public official is a director, officer, partner, trustee, employee, or holds any position of management.
 

 “For purposes of this section, indirect investment or interest means any investment or interest owned by the spouse or dependent child of a public official, by an agent on behalf of a public official, by any business entity controlled by the public official or by a trust in which he has a substantial interest. A business entity is controlled by a public official if the public official, his agents, spouse and dependent children hold more than fifty percent of the ownership interest in the entity. A public official has a substantial interest in a trust when the official, his spouse and dependent children have a present or future interest worth more than one thousand dollars ($1,000).”
 

 [3]
 

 Regulation 18703 provides, in part, as follows:
 

 “A material financial effect of a governmental decision on an official’s interests, as described in Government Code Section 87103(a) through (d), is distinguishable from its effect on the public generally unless the decision will affect the official’s interest in substantially the same manner as it will affect all members of the public or a significant segment of the public. Except as provided herein, an industry, trade or profession does not constitute a significant segment of the general public.
 

 “[(a) Omitted (elected officials).]
 

 “[(b) Omitted (elected officials).]
 

 “(c) An industry, trade or profession constitutes a significant segment of the public if the statute, ordinance or other provision of law which creates or authorizes the creation of the official’s agency or office contains a finding and declaration, including an express reference to Section 87103 of the Government Code, to the following effect:
 

 “The Legislature [or other authority] declares that the individuals] appointed to the office of-is [are] intended to represent and further the interest of the [specified industry, trade or profession], and that such representation and furtherance will ultimately serve the public interest. Accordingly, the Legislature [or other authority] finds that for purposes of persons who hold such office the [specified industry, trade or profession] is tantamount to and constitutes the public generally within the meaning of Section 87103 of the Government Code.
 

 “(d) Through January 1, 1979, an industry, trade or profession constitutes a significant segment of the public if the statute, ordinance or other provision of law which creates or authorizes the creation of the official’s agency contains a requirement or express authorization that members of that industry, trade or profession hold such office. After January 1, 1979, in the absence of an express finding and declaration of the type described in Paragraph (c) of this section, such an industry, trade or profession constitutes a significant segment of the public generally only if such a finding and declaration is
 
 *438
 
 implicit, taking into account the language of the statute, ordinance or other provision of law creating or authorizing the creation of the agency, the nature and purposes of the program, any applicable legislative history, and any other relevant circumstance.”
 

 [4]
 

 Food and Agricultural Code sections 58852, 901.5, 6006.5, 6039.5, 12041.5, 14971.5, 20462.5, 24007.1, 27571.1, 29322.1, 40571.1, 41002, 41201.1, 52291.1, 59738, 62115.1, 62719.1, 64118, 64605, 65576, and Business and Professions Code section 19627.8.
 

 [5]
 

 Attempts to determine legislative intent have been referred to as at best a Delphic divination.
 
 (Agricultural Labor Relations Bd.
 
 v.
 
 Superior Court
 
 (1976) 16 Cal.3d 392, 418 [128 Cal.Rptr. 183, 546 P.2d 687] [app. dism. 429 U.S. 802 (50 L.Ed.2d 63, 97 S.Ct. 33, 34)].) From the beginning of California’s judicial history the elusive search for legislative intent has sometimes led to bizarre results. (See
 
 People
 
 v.
 
 Hall
 
 (1854) 4 Cal. 399.)
 

 [6]
 

 Section 3625, subdivision (d), provided; “(d) Subdivision (a) of this section shall not apply if the action or decision affects an economic interest of the official as a member of
 
 *441
 
 the public or a significant segment of the public or as a member of an industry, profession or occupation, to no greater extent than any other such member of the public, segment of the public or an industry, profession or occupation.”
 

 [7]
 

 These guidelines are sometimes called “canons of construction” or “principles of statutory interpretation.” We recognize that generally there are two opposing “canons” or “principles” on almost every point. (See Llewellyn,
 
 Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed
 
 (1950) 3 Vanderbilt L.Rev. 395, 401.) Nevertheless, these often quoted “canons” cannot be totally ignored.
 

 [8]
 

 Nothing in the PRA prevents the Legislature from enacting laws creating future programs to benefit a particular industry, nor does the act prohibit the Legislature from creating agencies to administer such programs for the benefit of a particular industry.