Homer CARNEY, Cress Carney, Linda Dowie, Armella Carney, J.P. Ford, Steve Chronic, Max Prince and Mary Roundtree, Appellants,

v.

STATE of Alaska, BOARD OF FISHERIES, John Garner, Val Angasan, Jesse Foster and Robert Blake, Individually, Appellees.

No. S–2022.

Supreme Court of Alaska.

Jan. 19, 1990.

Arthur S. Robinson, Robinson, Beiswenger & Ehrhardt, Soldotna, for appellants.

Larri Irene Spengler, Asst. Atty. Gen., and Grace Berg Schaible, Atty. Gen., Juneau, for appellees.

OPINION

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

COMPTON, Justice.

Homer Carney and other commercial set netters (set netters) in the Nushagak district of Bristol Bay challenge regulations established by the Board of Fisheries (the Board). The challenged regulations limit the distance from shore the set netters may fish. The set netters allege that these regulations are invalid (1) because of conflicts of interest on the Board, four of the seven voting members of the Board having an interest in drift net fishing in Bristol Bay, and (2) because the regulations violate equal protection of law due the set netters by unjustifiably discriminating between set and drift netters. The trial court ruled against the set netters on both these issues. In addition, the set netters challenge trial court rulings dismissing all but one plaintiff on the ground of mootness and awarding attorney fees to the state. We reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. FACTUAL HISTORY.

Homer Carney, Cress Carney, Armella Carney, Linda Dowie, J.P. Ford, Max Prince, Steve Chronic and Mary Roundtree operate set net gear in the Nushagak commercial salmon fishing district in Bristol Bay. The set netters generally fish the same set net locations each year. The usual practice among the set netters is to fish and operate their nets with the flow of the tide, setting their nets out with the tide at low water and then bringing them in as the tide comes to high water. They operate these nets at distances of 1,000 to 5,000 feet from the high tide mark.

The Nushagak commercial salmon fishing district is one of five such districts in Bristol Bay. 5 AAC 06.200 (eff. before 1982). The portion of the district open to commercial salmon fishing is approximately 20 miles wide at its widest point and approximately 36 miles long. The district is divided into three sections, the Igushik, Snake River and Nushagak. 5 AAC 06.-200(a). These sections are then further divided into administrative areas. 5 AAC 06.200(a). All of the set netters involved in this appeal operate gear on the east side of the Nushagak section. Dowie operates in the Ekuk area, while the remainder operate in the Combine Flats area.

During the past 20 years both the number of persons fishing and salmon caught in the Nushagak District has increased significantly.[1] This increase in fishing activi-

1. The proportion of set to drift netters in the Nushagak district sockeye salmon fishery has fluctuated since the mid 1960's. From 1966 to 1977, the average number of set net gear permit holders was 145. From 1977 to 1983, the average number of set net gear permit holders increased to 221, a 52% increase over the number of such permit holders from 1966 to 1977. For the period 1966 to 1977, the average number of drift net gear permit holders in the Nushagak district was 345. From 1978 to 1983, the average number of drift net gear permit holders increased to 484, a 40% increase over the average number of such permit holders for the period 1966 to 1977.

The increase in participation by both set and drift netters in the Nushagak district from 1978

to 1983 coincides with an increase in the stock size of Nushagak sockeye runs during this period. The average annual catch of sockeye salmon in the Nushagak district from 1966 to 1977 was 790,000 fish, compared to an average annual catch of 5 million fish from 1978 to 1983.

Throughout Bristol Bay, the number of set and drift net permits actually fished also increased from 1978 to 1983. The percentage of set net permits actually fished increased from 76% to 96%. The percentage of drift net permits actually fished increased from 87% to 96%. From 1978 to 1983, an average of 1,685 drift net permit holders actually fished in Bristol Bay. Of that number, over 50% fished in the Nushagak district at some time during the season.

ty prompted the Board to adopt 5 AAC 06.331(n) (eff.1984)[2] at its February 1984 public meeting in Anchorage. This regulation restricts the distance from shore that set netters may operate their gear. Subsection (1) of the regulation restricts the distance from shore that set nets may be operated in the Combine Flats area. Subsection (2) of the regulation restricts the distance from shore that set nets may be operated in the Ekuk area. Prior to 1984, no regulation existed that restricted the distance from shore that set nets could be operated in the Nushagak district. However, such regulations did exist for other districts. *See, e.g.*, 5 AAC 06.331(i)(2) (eff. 1982, repealed 1985) (adopted in substance as 5 AAC 06.331(m) (eff.1985)).

The purpose of the regulation is to allocate water area and salmon resources between drift and set netters in the Nushagak section of the district. The state admits that its intent is to maintain historic allocation patterns between the two groups of fishers.

At the February Board meeting, testimony was presented from several people regarding "gear conflicts" that had occurred between set and drift netters in the Nushagak district during previous fishing seasons. The conflict was described as drift net gear becoming entangled with set net gear and set netters operating in areas believed to be "traditional" drift net areas.

Prior to taking public testimony on the Nushagak set net/drift net conflict at the February Board meeting, individual Board members made statements for the record regarding any conflict of interest they may have had pertaining to the Bristol Bay salmon fishery. After disclosing their conflicts, all the Board members were allowed to vote. While each interested Board member abstained from voting on the issue of his own participation, the interested members did not abstain from voting on the participation of the other members with like interests.[3]

After receiving public testimony, advisory committee reports, and input from the Departments of Fish and Game (DFG) and Public Safety (DPS), the Board, by a vote of six to one, adopted the subject regulation, 5 AAC 06.331(n). Three of the Board members who voted in favor of adoption of the regulation, Val Angasan, Jesse Foster and John Garner, held entry permits for the Bristol Bay drift net commercial salmon fishery at the time the regulation was adopted. All three were active participants in that fishery.[4] Another Board member

---

**2.** 5 AAC 06.331(n) (eff.1984), repealed May 11, 1985, states:

In the Nushagak District, no salmon interim-use or entry permit holder may set or operate a set gill net seaward of set gill nets operated by another salmon interim-use or entry permit holder. In the following locations, no part of a set gill net, anchor, peg, stake, buoy, or other device used to set the net may be seaward of the stated offshore distance:
(1) from the intersect of LORAN line 32440 × 44510 with Combine Beach, to the cannery dock at Clark's Point, 1,000 feet from the mean high tide mark [repealed 5/11/85];
(2) from the canner[y] dock at Clark's Point to an ADF & G regulatory marker at First Creek, 500 feet from the mean high tide mark, or to the minus three foot low tide mark, whichever location is closer to the mean high tide mark;
(3) from an ADF & G regulatory marker at First Creek to an ADF & G marker at Third Creek, 700 feet from the mean high tide mark;
(4) from an ADF & G regulatory marker at Third Creek to an ADF & G regulatory marker

at Etolin Point, 1,000 feet from the mean high tide mark.

**3.** The state notes that the procedure followed by the Board was that recommended by the Department of Law in 1983, following its 1982 opinion on conflict of interest. This procedure became part of the Executive Branch Ethics Act, Ch. 87 SLA 1986 (codified as AS 39.52.010–39.52.960).

**4.** Angasan had participated the most among the four Board members in question. In 1981, 55% of Angasan's total statewide harvest of salmon came from the Nushagak district. In 1982, 42% of his total harvest came from Nushagak. In 1983 and 1984, 7% and 2% of his total harvest, respectively, came from the Nushagak district.

Foster stated that he was a Bristol Bay drift netter and that he fished at Togiak. He stated that he might have a potential conflict of interest. He also stated he had never transferred to another district to fish. However, Foster in fact participated as a drift netter in the Nushagak district in 1980 and 1983. In 1980, 3½% of Foster's statewide harvest of salmon came from the Nushagak district. In 1983, nearly 5% of his harvest came from Nushagak.

who voted in favor of the regulation, Robert Blake, was at the time of its adoption a crewman in the Bristol Bay drift net fishery. He was a crewman previous to and subsequent to the adoption of the regulation. Blake also had been an entry permit holder in the Bristol Bay drift net fishery in 1980.

In 1985 the Board repealed 5 AAC 06.-331(n)(1), thereby repealing the distance restriction set net gear may be operated from shore at Combine Flats. *See supra* note 2. The restrictions remain in effect at Ekuk.

## B. PROCEDURAL HISTORY.

On May 22, 1984, the set netters filed suit in the superior court seeking declaratory and injunctive relief against the enforcement of the challenged regulations. They challenged the validity of the regulation on the grounds that the regulation was adopted in violation of Alaska's conflict of interest statute, AS 39.50.090(a), and the impartiality provision of the Administrative Procedures Act, AS 44.62.630. They also alleged that the regulation as adopted violated equal protection under Article VIII, Sections 1, 2, 13, 14, 16 and 17 of the Alaska Constitution. Article VIII governs the state's use of its natural resources. The superior court on June 8, 1984, granted the set netters' motion for preliminary injunction and ordered enforcement of the regulation preliminarily enjoined.

Prior to final judgment, seven of the set netters were dismissed from the case because the regulation was changed for the 1985 season and these seven were no longer subject to its limitation. The court considered each count separately; all were ultimately dismissed on summary judgment in favor of the state. Attorney fees were

awarded to the state. The set netters appeal.

## II. DISCUSSION

Most of the issues in this appeal were decided on motions for summary judgment. On review of summary judgment this court may make an independent review to determine whether any issue of material fact remained in dispute, and whether the state was entitled to judgment on the law applicable to the established facts. *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

With regard to the question of whether the court properly awarded attorney fees to the state, the standard is whether the trial court abused its discretion. *Kenai Lumber Co. v. LeResche*, 646 P.2d 215, 222–23 (Alaska 1982).

## A. CONFLICT OF INTEREST.

At our request, the parties submitted supplemental briefing on the issue of whether the Board's action violated common law conflict of interest principles. Because we hold that the Board's action did violate the common law, we do not reach the AS 39.50.090 and AS 44.62.630 issues.

The state is of the view that AS 39.50.090 does not abrogate common law principles,[5] basing its view on a formal opinion of the attorney general:

[T]he existence of criminal statutes (such as AS 39.50.090) does not extinguish the common law rights and remedies which would ordinarily exist. We believe that the same rule would apply in Alaska: AS 39.50 will not be held to repeal, amend, or pre-empt the common law of conflict of interests which will apply 'unless and until the Alaska Legislature acts to modify it.' *Surina v. Buckalew*, 629 P.2d

In 1984, after the adoption of the regulation under review in this appeal, 11% of Board member Garner's statewide harvest of salmon was from the drift net fishery in the Nushagak district. However, between 1980 and 1983 Garner's Nushagak harvest never exceeded 1% of his statewide harvest.

Blake participated in the Nushagak drift net fishery as an entry permit holder in 1980. In that year 24% of his total statewide harvest of

salmon was derived from the Nushagak district. He stated at the meeting that a major portion of his involvement in commercial fisheries is in the Bristol Bay drift net fishery.

5. We note that the Executive Branch Ethics Act, AS 39.52.010–39.52.960, not enacted until after this regulation was adopted by the Board, expressly supercedes the common law on conflict of interest. AS 39.52.910(b).

969, 973 (Alaska 1981). Thus, a person may act illegally without violating the *criminal* law, and serious non-penal consequences may follow.

1982 Op. Att'y Gen. No. 15 (Alaska, Dec. 3, 1982), pp. 9–10 (emphasis in original). *See also* AS 01.10.010. On the other hand, the set netters conclude that the statute is but a codification of the common law. In fact, however, they present two separate arguments: (1) The drift netters on the Board were acting in fact upon their private business in performance of their public duty; (2) some financial gain could flow to the Board members by enactment of the regulation, simply by virtue of their participation in the Bristol Bay fishery. Their first argument is based on AS 39.50.090, while their second is based on common law.

We find the state's view persuasive. Opinions of the attorney general, while not controlling on matters of statutory interpretation, are entitled to some deference. *Allison v. State*, 583 P.2d 813, 816 n. 15 (Alaska 1978). AS 39.50.090 does not abrogate the common law. AS 39.50.-090 focuses on the intent of the public official, *i.e.*, whether the public official's primary purpose is to obtain personal financial gain. On the other hand, the focus of the common law appears to be on the relationship between the public official's financial interest and the possible result of the official's action, regardless of the official's intent. *See Marsh v. Town of Hanover*, 113 N.H. 667, 313 A.2d 411, 414–15 (1973).

However, the state also argues that none of the Board members' interests were of a magnitude to constitute the type of conflict of interest prohibited at common law. We disagree.

The state relies in part on *Consumers Union of United States v. California Milk Producers Advisory Bd.*, 82 Cal.App.3d 433, 147 Cal.Rptr. 265 (1978). In that case the Consumers Union alleged that members of industries, sitting on state regulatory boards affecting their industry, violated state conflict of interest laws. The court ruled against the Consumers Union, writing:

> Merely because a board member derives income from within a given industry, he or she does not lose the ability to be objective. Nor does that person lose the capacity to make decisions beneficial to the public's interest. The public interest emerges from the competing interests of various groups in our society, including those from a given industry. The Act does not disallow that board member, who has a knowledge and a comprehension of how the industry interacts with society, from participating in governmental decisions which affect that industry.

*Id.* 147 Cal.Rptr. at 274.

The *Consumers Union* court did recognize, however, that board members interests may sometimes be at odds with the interests of the industry at large:

> The regulation thus allows industry board members to participate in governmental decisions that affect their financial interests if such decisions would similarly affect others in the same industry, trade or profession. Board members must, however, disqualify themselves from participating in decisions that affect their own interests in a manner different from the interests of the members of the industry.

*Id.* 147 Cal.Rptr. at 268.

In this case, the individual interests of the four board members were significantly different with regard to this particular fishing district from the interests of the fishing industry as a whole. The effect of this regulation was to benefit drift netters in the limited area of the Nushagak district at the expense of set netters in the same district. The board members here were actively fishing in the Nushagak district with drift nets, or employed by those who were, at the time the regulation was adopted. *See supra* note 4. Thus, while the Board members could have participated in generalized decisions dealing with gear conflicts, they should have abstained from decision-making concerning discrete areas such as the Nushagak district in which their operations made them narrowly and specifically interested. *See Copple v. City*

*of Lincoln,* 202 Neb. 152, 274 N.W.2d 520, 527 (1979). *Cf. Van Itallie v. Borough of Franklin Lakes,* 28 N.J. 258, 146 A.2d 111, 117 (1958) (interest only in surrounding areas not sufficient to disqualify). Because a majority of the votes cast to pass the regulation are invalid, so is the regulation.[6]

## B. DISMISSAL OF SEVEN OF THE EIGHT PLAINTIFFS.

For the 1985 season, the Board amended the subject regulation to eliminate the 1,000 foot maximum distance for the northernmost section of shore, the Combine Beach area. *See supra* note 1. Seven of the eight plaintiffs in this case have fished, and state they intend to fish, on Combine Beach. Thus, they would no longer be injured by the regulatory provisions challenged in this lawsuit. Only one plaintiff, Linda Dowie, fishes on the stretch of beach regulated by 5 AAC 06.331(n)(2). She has always fished there, and apparently intends to continue fishing there.

■ To bring a lawsuit in Alaska's courts an individual must have the requisite standing. Standing requires the showing of some interest/injury. AS 44.62.300; *Trustees for Alaska v. State,* 736 P.2d 324, 327 (Alaska 1987) *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2013, 100 L.Ed.2d 601 (1988). In this case, however, none of the plaintiffs other than Linda Dowie could demonstrate an interest in the outcome of the controversy. Any harm they might have suffered with respect to the regulation as originally adopted by the Board has been mooted by the 1985 amendment.

■ The set netters argue that this case falls within the public interest exception to the mootness doctrine. *See Rutter v. State,* 668 P.2d 1343, 1346 (Alaska 1983). This is not, however, an instance where the public interest exception is necessary to review the issues presented by the case. The issues are not moot as to plaintiff Linda Dowie. Thus the issues raised in the lawsuit will not evade review. The superior court was thus correct in dismissing the case with respect to the other seven plaintiffs, because they are no longer potentially injured by the regulation.

## C. ATTORNEY FEES.

■ Finally, the set netters argue that the superior court erred in awarding attorney fees to the state. They argue attorney fees should not be awarded because they are public interest litigants. The criteria for identifying public interest suits were articulated in *Alaska Survival v. State of Alaska, Dep't of Natural Resources,* 723 P.2d 1281 (Alaska 1986):

1) whether the case is designed to effectuate strong public policies;

2) whether, if the plaintiff succeeds, numerous people will benefit from the lawsuit;

3) whether only a private party could be expected to bring the suit; and

4) whether the litigant claiming public interest status would lack sufficient economic incentive to bring the lawsuit if it did not involve issues of great public importance.

*Id.* at 1292.

There is no evidence on the record to suggest that numerous people will benefit from this lawsuit. While Carney *et al.* allege that they will be required to curtail fishing 1,000 to 5,000 feet out by this regulation, they do not allege that set netters in general will be so impacted. Furthermore, Carney *et al.* have sufficient economic incentive to bring this suit, even were other criteria for public interest status met. The superior court was correct in its finding that the set netters are not public interest litigants. Nevertheless, our reversal necessitates setting aside the award of attorney fees to the state.

## III. CONCLUSION

The judgment is AFFIRMED in part, REVERSED in part, and the case is RE-

---

6. In light of our resolution of this issue, we also decline to address the set netters' equal protection claims. In addition, nothing in this opinion should be construed so as to cast impressions on the validity or scope of the Alaska Executive Board Ethics Act, AS 39.52.010–39.52.960.

MANDED to the superior court for further proceedings consistent with this opinion.