[S. F. No. 22574. In Bank. July 19, 1968.]

FRED E. HUNTLEY et al., Petitioners, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Respondent; PACIFIC TELEPHONE AND TELEGRAPH COMPANY, Real Party in Interest.

68

Reed H. Bement and Marshall W. Krause for Petitioners.

Mary Moran Pajalich, Roderick B. Cassidy, Timothy E. Treacy and W. Roche for Respondent.

Pillsbury, Madison & Sutro, John A. Sutro, Noble K. Gregory and George A. Sears for Real Party in Interest.

PETERS, J.—Petitioners, American Civil Liberties Union of Northern California and the real party in interest Fred E. Huntley, seek review of Decision No. 72568 of the Public Utilities Commission modifying and approving as modified revi-

sions of tariff schedules Nos. 32-T and 36-T of Pacific Telephone and Telegraph Company (hereafter referred to as PT&T). The schedules provide that subscribers who transmit recorded messages over its facilities must include in the recording the name of the individual or organization responsible for the message and the address at which the service is rendered. The commission later modified the tariff schedules by excusing the message sender from furnishing his address, if the address is published in a current directory listing. Failure to comply with these provisions is cause for termination of the automatic recording service.

The regulation traces its ancestry to complaints made by various organizations to the Federal Communications Commission (hereafter referred to as FCC) about anonymous recorded telephone messages. The tenor of the complaints was that the messages were often abusive or libelous attacks on individuals and institutions, and that anonymity encouraged such irresponsible action. Congressional hearings followed to explore possible legislation. In response to an FCC request American Telephone and Telegraph Company advised its subsidiaries (which include PT&T) to make available upon inquiry the names and addresses of subscribers to automatic announcements services. Since October 1965 PT&T has followed this policy.

In an attempt to avoid pending federal legislation, PT&T and the other Bell System companies prepared tariff provisions requiring that recorded public announcements include the names and addresses of those responsible for the message. Similar regulations were approved by the appropriate state agencies in 46 states and are now in effect.

The California regulation originated on December 30, 1965, when PT&T filed Advice Letter No. 9212 with the Public Utilities Commission (hereafter referred to as the commission) proposing to revise its tariff schedules Nos. 32-T and 36-T so as to require its subscribers to include in their recorded announcement their names and the address at which the service is provided. Failure to comply with this requirement, it was proposed, would be cause for termination of that particular service. Responding to complaints to the proposal, the commission initiated investigatory proceedings, ultimately resulting in the decision now before this court upholding the constitutionality and lawfulness of the regulation.

PT&T has about 5,700 automatic answering devices in operation. The devices fall into three categories: automatic

answering (about 2,300 installations); automatic answering and recording (about 3,200 installations); and recorder coupler (about 200 installations). Depending upon the nature of the equipment, the caller may just hear a message, record a message or hear and record a message. Pre-recorded messages are typically used by theaters to announce current programs, by religious organizations to offer prayers, by commercial organizations to advertise services or products, and by individuals or organizations to present their views on current topics.

The regulation in question adversely affects only about 5 percent of those using the automatic answering services because the vast majority of the subscribers are anxious to publicize their sponsorship of the messages, and so are willing to include their name and address in their announcing message.

Petitioner Huntley, under the slogan "Let Freedom Ring," uses the service to declare his views on certain subjects which co-petitioner American Civil Liberties Union characterizes as "superpatriotic or conservative." Although Huntley identified his message with the Let Freedom Ring organization, he did not give his name or any address, and refuses to include such information in his announcing message.

In reviewing orders or decisions of the commission challenged on constitutional grounds, this court is required to exercise its independent judgment on the law and the facts. The findings or conclusions of the commission on the constitutional question are not final. (Pub. Util. Code, § 1760.) This does not mean, however, that this court should disregard the weight properly attached to findings after a hearing and evidence. (*Pacific Tel. & Tel. Co.* v. *Public Utilities Com.*, 62 Cal.2d 634, 646 [44 Cal.Rptr. 1, 401 P.2d 353].)

In the instant case, the parties do not present any factual questions. Petitioners urge that the identification requirement required by the commission unduly violates freedom of speech as guaranteed by the First and Fourteenth Amendments of the United States Constitution and by article I, section 9 of the California Constitution.

Freedom of speech assured by the First Amendment is one of the basic tenets of a free society. As aptly stated by Justice Holmes in 1919, "when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own

conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution." (*Abrams* v. *United States*, 250 U.S. 616, 630-631 [63 L.Ed. 1173, 1180, 40 S.Ct. 17] (dissenting opinion).)

Freedom of speech encompasses more than simply the right to be protected from censorship of content. It extends to communication in its most fundamental sense. The First Amendment embraces both the right to disseminate information (*Martin* v. *Struthers*, 319 U.S. 141, 143, 146-147 [87 L.Ed. 1313, 1316, 1318-1319, 63 S.Ct. 862]; *Lovell* v. *Griffin*, 303 U.S. 444, 452 [82 L.Ed. 949, 954, 58 S.Ct. 666] )and necessarily the right to receive it (*Lamont* v. *Postmaster General*, 381 U.S. 301 [14 L.Ed.2d 398, 85 S.Ct. 1493]).

■ Improper restraints on communication may vary in form and degree, but all have the effect of restricting the dissemination of ideas. The clearest abuse is an outright prohibition of a constitutionally protected form of speech. (*Martin* v. *Struthers, supra,* 319 U.S. 141; *Wirta* v. *Alameda-Contra Costa Transit Dist.,* 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982].) Regulation short of absolute prohibition is also invalid when expression is made dependent on state approval by the obtaining of a permit (*Kunz* v. *New York,* 340 U.S. 290 [95 L.Ed. 267, 71 S.Ct. 312]) or is conditioned upon obtaining the approval of a board of censors (*Freedman* v. *Maryland,* 380 U.S. 51 [13 L.Ed.2d 649, 85 S.Ct. 734]). Nor does the restriction become permissible because it merely limits the manner of expression rather than the initial right to communicate. (*Saia* v. *New York,* 334 U.S. 558 [92 L.Ed. 1574, 68 S.Ct. 1148]; *Wollam* v. *City of Palm Springs,* 59 Cal. 2d 276, 288 [29 Cal.Rptr. 1, 379 P.2d 481].)

■ First Amendment freedoms are not only protected from patent restraints, but also from more subtle forms of governmental interference. (E.g., *Bates* v. *Little Rock,* 361 U.S. 516, 523 [4 L.Ed.2d 480, 485, 80 S.Ct. 412].) In the association cases the compelled disclosure of membership was condemned as an unwarranted infringement of First Amendment rights. (*Bates* v. *Little Rock, supra,* 361 U.S. 516; *N.A.A.C.P.* v. *Alabama,* 357 U.S. 449 [2 L.Ed.2d 1488, 78 S.Ct. 1163].) It has also been recognized that anonymity of affiliation may be indispensable to free association. In both

*Bates* v. *Little Rock* and *N.A.A.C.P.* v. *Alabama,* it was apparent that disclosure would subject the members of the N.A.A.C.P. to physical, economical and social reprisals, deterring present members from associating and dissuading others from joining. The court emphasized that even though the immediate restraint was harassment by the *public,* the state could not disclaim responsibility for ''merely'' compelling disclosure. ''The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power . . . that private action takes hold.'' *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 463 [2 L.Ed.2d 1488, 1500].)

There can be no doubt that disclosure requirements may deter free speech. It must be remembered that the right of freedom of speech is primarily intended to protect minority views. ''The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightment was ever to triumph over slothful ignorance.'' (*Martin* v. *Struthers, supra,* 319 U.S. 141, 143 [87 L.Ed. 1313, 1316].)

The majority may freely assert its beliefs and is secured freedom of speech by the very fact of its mathematical majority. It is the minority, whether of the left or the right, which must overcome accepted views. To succeed, the minority must persuade others until, as is the nature of a democratic society, it hopefully attains the status of the majority. In doing so, the minority will frequently be subjected to criticism and debate, a necessary adjunct to the ascertainment of truth. But, depending upon the popularity of the minority position and the inviolability of the majority beliefs, the proponents of change may also be subjected to harassment, threats and violence.

In this context, as correctly contended by petitioners, anonymity may be an indispensable prerequisite to speech. When the content of speech may lead to harassment or reprisal, fear or apprehension may deter expression in the first instance. History is replete with unpopular ideas which now form the foundation of modern society's mores and laws, but which could only be asserted anonymously when first expressed.

*Talley* v. *California,* 362 U.S. 60 [4 L.Ed.2d 559, 80 S.Ct. 536], establishes that the First Amendment right of freedom of speech includes the right to remain anonymous. The

Supreme Court reviewed a Los Angeles city ordinance which prohibited distribution of any handbill unless there was imprinted on the document the name and address of the person who produced it and who caused the same to be distributed. The court noted that ''Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. . . . The old seditious libel cases in England show the lengths to which government had to go to find out who was responsible for books that were obnoxious to the rules. . . . Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes.'' (*Id.* at pp. 64-65 [4 L.Ed.2d at pp. 562-563].)

The ordinance in *Talley* was not limited to handbills which were obscene or offensive to public morals, nor did it seek to identify those responsible for fraud, false advertising or libel. ''This ordinance simply bars all handbills under all circumstances anywhere that do not have the names and addresses printed on them in the place the ordinance requires.'' (*Id.* at p. 64 [4 L.Ed.2d at p. 562].) The court concluded that the indiscriminate overbreadth of the ordinance made it constitutionally obnoxious. ''There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression.'' (*Ibid.*)

The First Amendment right to remain anonymous recognized in *Talley* clearly encompasses all forms of expression whether they be writings, or as in the instant case, a recorded message published over the telephone.

■ The commission correctly asserts that freedom of speech is not absolute. However, to justify any impairment, there must be present ''compelling state interest . . . [which] justifies the substantial infringement of appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation,' [citation].'' (*Sherbert* v. *Verner*, 374 U.S. 398, 406-407 [10 L.Ed.2d 965, 971-972; 83 S.Ct. 1790].)

It is also true that there is no absolute right to anonymity. *Canon* v. *Justice Court,* 61 Cal.2d 446 [39 Cal.Rptr. 228, 393 P.2d 428] so held. But, again, to justify any impairment there must be a "compelling state interest." In the *Canon* case, this court upheld against First Amendment attack Election Code section 12047 which made it a misdemeanor to anonymously write or distribute publications "designed to injure or defeat any candidate for nomination or election to any public office by reflecting upon his personal character or political action, . . ."[1] The evil sought to be deterred was "scurrilous hit-and-run smear attacks which are all too common in the course of political campaigns." (*Id.* at p. 453.) The court recognized that section 12047 impaired freedom of speech but held that it did so in a most limited manner to protect a legitimate state purpose. The statute was narrowly drafted, applying only to (1) election campaigns (2) where the writing attacked a candidate (3) on a personal matter. Section 12047 reached irresponsible defamation of a candidate's personal life, an area not constitutionally protected (*New York Times Co.* v. *Sullivan,* 376 U.S. 254, 301 [11 L.Ed.2d 686, 720, 84 S.Ct. 710, 95 A.L.R.2d 1412]), and fostered free and truthful elections, an environment necessary to the intelligent exercise of suffrage. (Cf. *California Democratic Council* v. *Arnebergh,* 233 Cal.App.2d 425 [43 Cal.Rptr. 531], upholding against First Amendment attack the "Truth in Endorsements" Law (Elec. Code, § 8600 et seq.).)

It bears emphasis that the disclosure requirement upheld in *Canon did* abridge freedom of speech (61 Cal.2d at p. 460), but under the *particular* facts, the infringement was minimal and justified by a sufficient state interest.

The commission urges that in the instant case any trespass of freedom of speech is similarly justified. The commission specifically contends that the regulation is designed "to balance an interest of an individual subscriber against the interests of all subscribers and the public as a whole." This argument lacks merit. The commission does not set forth what interests of the subscribers require the abridgment of First Amendment rights. Nothing in the record indicates that the regulation was based on a fear of defamation. Moreover, a person libeled by a recording can readily ascertain the identity of his defamer from PT&T's records. If the interests of

---

[1] However, we found that section 12047 unconstitutionally discriminated in favor of California residents.

the subscribers are to identify the author of "irresponsible" messages, then, the tariff is still an unwarranted invasion of freedom of speech. Too often the test of "responsibility" is the degree of popular acceptance of the idea. ▆ Popularity is not a criterion for determining the boundaries of speech. Even erroneous statements are entitled to constitutional protection. (*Bond* v. *Floyd*, 385 U.S. 116, 136 [17 L.Ed.2d 235, 247, 87 S.Ct. 339].)

The commission argues that *Talley* deals only with "primary actors," and that PT&T as an "intervening neutral or unsympathetic" commercial instrumentality may disassociate itself from authorship of the message by compelling disclosure.

The United States Supreme Court has never distinguished between "primary actors" and "intervening neutral or unsympathetic commercial instrumentalities." PT&T is not a neutral instrumentality as is a newspaper which may divorce itself from an advertisement in any manner it chooses. ▆ But the telephone company is a public utility subject to the control of the commission, a state agency. The proposed tariff is efficacious *only* because of state action. (Cf. *Public Utilities Com.* v *Pollak*, 343 U.S. 451, 462-463 [96 L.Ed. 1068, 1077-1078, 72 S.Ct. 813].) Constitutional scrutiny of state action is not predicated upon finding a direct restriction, there only need be a causative relation between the state action and the obnoxious result. (*N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 463 [2 L.Ed.2d 1488, 1500].)

The commission's reliance on *Sokol* v. *Public Utilities Com.*, 65 Cal.2d 247 [53 Cal.Rptr. 673, 418 P.2d 265], is misplaced. In *Sokol*, this court held that PT&T was not liable for damages caused by its compliance with an unconstitutional regulation imposed by the commission. This does not even imply that the commission can continue to enforce an invalid regulation simply because PT&T may not be responsible for complying with the regulation. The *Sokol* case has no application to the instant one.

PT&T also urges that identification is necessary, otherwise callers might assume that the message was sponsored by the telephone company. This assertion borders on the frivolous. It is very doubtful that callers would ascribe the contents of a recorded message to PT&T. This supposed danger would exist even where the message was not pre-recorded but recited by an anonymous individual. But even were there merit in this contention, the tariff would fail because of its overbreadth.

█ As stated by the United States Supreme Court in *Shelton* v. *Tucker*, 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247], "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (Cf. *Sherbert* v. *Verner, supra,* 374 U.S. 398, 407 [10 L.Ed.2d 965, 972].) Obviously, the telephone company could allay its fears by simply requiring the subscriber to state that the message was not sponsored by the telephone company. (Cf. *Wirta* v. *Alameda-Contra Costa Transit Dist., supra,* 68 Cal.2d 51.) This would fully protect the telephone company's reputation while not infringing upon First Amendment rights.

Respondents contend that the instant case is controlled by *Lewis Publishing Co.* v. *Morgan,* 229 U.S. 288 [57 L.Ed. 1190, 33 S.Ct. 867], where the Supreme Court upheld the constitutionality of section two of the Post Office Appropriation Act of 1912 which required the users of second-class mailing privileges to annually publish with the post office and the public the names of their officers, owners, and creditors. Respondents ingenuously argue that failure to comply with the identification requirement would only result in loss of recorded message services, leaving other alternatives, as was true in *Lewis Publishing Co.* v. *Morgan,* where first-class mail was still available.

█ Restraints on freedom of speech are not justified simply because alternative forms of expression are available. (*Saia* v. *New York, supra,* 334 U.S. 558; *Wollam* v. *City of Palm Springs, supra,* 59 Cal.2d 276.) The commission relies upon the result of the Supreme Court's decision, not upon the reasons given. The identification requirement was upheld, not because of the available alternative of first-class mails, but because it was necessary for assignment of second-class privileges which were implemented to encourage circulation of newspapers, periodicals, etc. The court found that "the additional exactions as to disclosure of stockholders, principal creditors, etc., also are as clearly incidental to the power to classify as are the requirements as to disclosure of ownership, editors, etc., which for so many years formed the basis of the right of admission to the [second-class] classification." (229 U.S. at p. 315 [57 L.Ed. at p. 1203].) Respondents present us with no state or public utilities function which necessitates identification to be operative.

Lastly, respondents contend that we should uphold the constitutionality of the regulation since similar provisions may be found in the Federal Communications Act of 1934 as amended in 1960. (47 U.S.C. § 317 (a)(2).) Section 317 requires a broadcasting station to identify any person or organization which furnishes material concerning a political program or program involving discussion of any controversial issue.

The analogy is not persuasive. In the first place, the federal statute has never been constitutionally tested.[2] It is true that insofar as section 317 requires identification of the sponsor of the message it is similar to the regulation before us. But, there the similarity ends. The environment of broadcasting stations is totally different from telephone service. The airways, by their very nature, necessitate federal licensing laws as to the number and permissible operating power of broadcasting stations. Because of the limited number of licenses available and significant influence of broadcasts, this is an area which greatly affects the public interest, and therefore can be carefully regulated to serve that interest. A "telephone number" hardly enjoys the same monopolistic position of a radio or television station. The broadcasts are imposed on the public generally and indiscriminately; whereas, a recorded telephone message must be actively sought by the caller. Moreover, unlike recorded telephone messages radio or television broadcasts require substantial expenditures.[3] An organization large enough to afford radio or television time would be less susceptible to harassment or reprisals, and less likely to be intimidated than the user of the inexpensive telephone service.

For these reasons, section 317, as yet constitutionally untested, is not compelling authority for upholding a tariff schedule clearly falling within the constitutionally protected area recognized by the Supreme Court in *Talley*.

 The tariff schedules unquestionably impair the First Amendment's guarantees of freedom of speech. Respondents have failed to establish a legitimate state interest justifying such impairment. The claimed need of PT&T to disassociate

[2]The only decision discovered relating to section 317 did not deal with the validity of the statute. The court simply held that a broadcasting station was not amenable to the penalties of section 503 for its inadvertent but good faith failure to identify the sponsor of a political broadcast. (*United States* v. *Midwest Radio-Television, Inc.*, 249 F.Supp. 936.)

[3]The subscriber pays PT&T $35 for installation and $13.50 per month for use of the equipment.

itself from authorship of the recorded messages may be achieved in a manner not restrictive of First Amendment rights.

The decision is annulled.

Traynor, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Schauer, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.