75 F.3d 1350
 96 Cal. Daily Op. Serv. 671, 96 Daily Journal
D.A.R. 1017
The PEOPLE OF the STATE OF CALIFORNIA; Public Utilities
Commission of the State of California; Petitioners,
Pennsylvania Public Utility Commission ("PAPUC"); Southern
California Coalition on Battered Women; Toward Utility Rate
Normalization ("TURN"); Consumer Federation of America;
Consumer Action; The National Association of Social Workers
("NASW"); The California Alliance Against Domestic
Violence; The Family Violence Prevention Fund;
Petitioners-Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America; Respondents,
US West Communications; MCI Telecommunications Corporation;
Ad hoc Telecommunications Users Committee ("Committee");
AT & T Corporation; The National Association of Regulatory
Utility Commissioners; National Association of Consumer
Advocates (NASUCA), Ameritech Operating Companies;
Southwestern Bell Telephone Company; Pacific Bell; United
States Telephone Association (USTA); BellSouth Corporation;
Respondents-Intervenors.
The PEOPLE OF the STATE OF CALIFORNIA; Public Utilities
Commission of the State of California; Petitioners,
Consumer Federation of America; Southern California
Coalition on Battered Women; National Association of
Regulatory Utility Commissioners ("NARUC"); Toward Utility
Rate Normalization ("TURN"); California Alliance Against
Domestic Violence; The Family Violence Prevention Fund
("Fund"); Consumer Action; National Association of Social
Workers ("NASW") and The Pennsylvania Public Utility
Commission ("PAPUC"); Petitioners-Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America; Respondents,
BellSouth Telecommunications, Inc. ("BellSouth");
Southwestern Bell Telephone Company; National Telephone
Cooperative Association; GTE California Incorporated
(hereinafter "GTEC"); MCI Telecommunications Corporation;
The United States Telephone Association ("USTA"); US West
Communications; Ad hoc Telecommunications Users Committee;
Respondents-Intervenors.
AT & T CORPORATION, Petitioners,
MCI Telecommunications Corporation; Consumer Federation of
America; Consumer Action; National Association of Social
Workers; California Alliance Against Domestic Violence;
The Family Violence Prevention Fund; Southern California
Coalition of Battered Women; Petitioners-Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America; Respondents,
Southwestern Bell Telephone Company ("Southwestern Bell");
National Telephone Cooperative Association; Bell Atlantic
Telephone Companies ("Bell Atlantic"); Ameritech; GTE
Service Corporation ("GTE"); Respondents-Intervenors.
COMPETITIVE TELECOMMUNICATIONS ASSOCIATION; Petitioner,
Consumer Federation of America, California Alliance Against
Domestic Violence & The Family Violence Prevention
Fund; Petitioners-Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America; Respondents.
 Nos. 94-70197, 95-70470, 95-70519 and 95-70571.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 16, 1995.
Decided Jan. 31, 1996.
 
 Mark Fogelman, Public Utilities Commission of the State of California, San Francisco, California; David W. Carpenter, Sidley & Austin, Chicago, Illinois; Robert J. Aamoth, Reed Smith Shaw & McClay, Washington, D.C. (on the briefs), for petitioners.
 John P. Stern, William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, Washington, D.C., for respondents.
 
 
 1
 Thomas J. Long, Toward Utility Rate Normalization, San Francisco, California; Gus T. May, Center for Law in the Public Interest, Los Angeles, California; Roberta M. Ikemi, California Women's Law Center, Los Angeles, California; William Gwire, San Francisco, California; James Bradford Ramsay, National Association of Regulatory Utility Commissioners, Washington, D.C.; Carolyn L. Polowy, National Association of Social Workers, Washington, D.C.; Maureen A. Scott, Pennsylvania Public Utility Commission, Harrisburg, Pennsylvania, (on the briefs), for petitioners-intervenors.
 
 
 2
 John Gibson Mullan, Kirkland & Ellis, Washington, D.C.; Michael R. Doyen (on the briefs), Munger, Tolles & Olson, Los Angeles, California, for respondents-intervenors.
 
 
 3
 Petitions to Review Orders of the Federal Communications Commission.
 
 
 4
 Before: SCHREODER and ALARCON, Circuit Judges, and WHALEY,* District Judge.
 
 ALARCON, Circuit Judge:
 
 5
 California's Public Utilities Commission ("CPUC") has filed two petitions seeking review of the Federal Communications Commission's ("FCC") decision denying reconsideration of the FCC's rule that subscribers who fail to choose the method to prevent disclosure of their nonpublished[1] telephone numbers, when Caller ID service becomes effective, must be served with a system that requires the customer to dial each time a call is made ("per call blocking") to protect his or her privacy. CPUC argues that this rule violates federal constitutional rights, and arbitrarily and capriciously preempts the CPUC rule that emergency service organizations and subscribers with nonpublished numbers, who fail to communicate their choice ("default")[2] between per call blocking and a system that blocks disclosure on all calls unless the calling party dials ("per line blocking"), be served with a system that blocks disclosure on all calls.
 
 
 6
 AT & T Corporation ("AT & T") and Competitive Telecommunications Association ("CompTel") have filed separate petitions in which they seek review of the denial of their petitions for reconsideration of the FCC's decision requiring telephone carriers using Common Channel Signalling System 7 ("SS7")[3] to deliver calling party numbers ("CPN") without charge (the "free passage" rule) to other telephone carriers.
 
 
 7
 AT & T and CompTel filed their petitions in the District of Columbia Circuit. The petitions for review filed by CPUC, AT & T, and CompTel were consolidated by the Judicial Panel on Multidistrict Litigation.[4]
 
 
 8
 We conclude that the FCC did not act arbitrarily and capriciously in ruling (1) that the preemption of the CPUC's rule was necessary to prevent negation of a valid FCC regulatory goal, and (2) that the imposition of the per call blocking option on subscribers with nonpublished numbers and emergency service organizations, who do not make a choice between Caller ID blocking systems, does not violate any federal constitutional right. We uphold the FCC's free passage rule because the record shows that the FCC examined the relevant evidence and adequately explained all aspects of its decision.
 
 
 9
 We have divided the opinion into two parts. In Part One, we review CPUC's challenge to the FCC's preemption of the type of Caller ID blocking service that must be offered to emergency service organizations and subscribers with nonpublished telephone numbers who do not make an election. In Part Two, we consider the claims of AT & T and CompTel that the free passage rule violates the requirements of the Administrative Procedures Act ("APA"), and is arbitrary and capricious. To set the stage for our discussion of these discrete questions, we will summarize the historical facts and procedural steps that preceded this current legal contest.
 
 
 10
 The provision of telephone services is divided between local exchange carriers ("LECs") and long distance carriers ("IXCs"). LECs generally provide all telephone services within their authorized local calling areas, and the vast majority of intrastate toll calls. The local carriers also provide access to IXCs. Virtually every long distance call originates with one LEC and terminates with another LEC. The IXCs run lines between local calling areas. They pay access fees to LECs to originate and to terminate long distance calls. IXCs earn revenue only when the called party accepts a long distance call. IXCs pay the LECs access fees for each long distance call, however, whether or not it is completed.
 
 
 11
 With the exception of toll free calls to 800 and 900 numbers, the calling party selects its long distance carrier. In contrast to LECs, however, an IXC does not have a business relationship with residential or commercial customers who receive long distance calls.
 
 
 12
 Like the LECs, AT & T and many other IXCs have invested in SS7, both by installing it in their own networks, and by establishing SS7 interconnections with LECs to allow the passage of CPN. AT & T reported that its capital investment in SS7 exceeds one billion dollars. Other IXCs, such as CompTel, have not yet installed SS7 systems.
 
 
 13
 The consolidated cases before this court involve challenges to the FCC's efforts to promote the availability of interstate Caller ID.[5] Caller ID is a service that permits a customer who receives a call to see the number of the person who placed the call unless the calling party blocks disclosure of the number.[6]
 
 
 14
 CPN is transmitted by means of SS7, a relatively new technology. Caller ID service is presently available only on local calls carried by LECs over their SS7 systems. Today, LECs in 47 states and the District of Columbia offer some form of Caller ID for intrastate calls. On June 17, 1992, the CPUC authorized California LECs to offer intrastate Caller ID service. The CPUC decision provides that each subscriber shall have a choice between per call and per line blocking without cost. The CPUC's ruling requires telephone companies to conduct a vigorous notice and education program regarding Caller ID and the available blocking options to protect a subscriber's privacy.[7] The CPUC also determined that emergency service organizations and subscribers who pay monthly charges for nonpublished telephone numbers and do not communicate their choice, will receive per line blocking service. All other subscribers who do not make a choice will receive per call blocking service.
 
 
 15
 Although the CPUC authorized the introduction of Caller ID for intrastate calls in 1992, LECs in California, including Pacific Bell and GTE California, have not yet offered intrastate Caller ID service. Instead, they petitioned the CPUC for reconsideration of its blocking default rule. They argued that the CPUC should order LECs to provide per call blocking for all subscribers who do not communicate their choice.
 
 
 16
 In 1991, the FCC recognized that some IXCs were building the SS7 facilities needed to transmit CPN and other services on interstate calls. The FCC concluded that it would be in the public interest to adopt rules to encourage and to regulate the development of SS7 services. The FCC initiated the rulemaking process that led to the order currently under review on September 26, 1991.[8] The FCC's Notice of Proposed Rulemaking ("NPRM") solicited comments on a tentative federal regulatory model for interstate CPN services. The FCC's proposed goals for this model included promoting the availability and development of new consumer services, balancing the relevant privacy interests of the calling party and the called party,[9] and ensuring end-to-end passage of the CPN by IXCs participating in interstate calls. Over 100 comments were received by the FCC.
 
 
 17
 Following the comment period, the FCC released its First Report and Order ("First R & O") on March 6, 1994. In the First R & O, the FCC concluded that interstate passage of CPN could bring a variety of benefits to consumers and promote technological innovation that would foster economic efficiency. The FCC determined that two issues created investor uncertainty and customer confusion about CPN: (1) inconsistent state regulatory schemes for CPN blocking options;[10] and (2) uncertainty regarding compensation for the interstate transmission of CPN.
 
 
 18
 The FCC found that the offering of Caller ID services did not violate the privacy of the calling party. The FCC determined that making per call blocking available on all interstate calls best accommodated the interests of the calling party and the called party. On that basis, the First R & O provided for the preemption of state regulation of Caller ID that prohibited per call blocking for interstate calls. The FCC also rejected per line blocking as an undue burden on the called party.
 
 
 19
 In its First R & O, the FCC also proposed the adoption of a rule requiring carriers to transport CPN to other carriers free of charge. The FCC reasoned that the unimpeded flow of the calling party's number throughout the network ensured to subscribers the broadest choices. The FCC also found that free passage of CPN eliminated costs, that would have occurred in negotiations regarding cost allocation between the carriers, that could delay or impede development of CPN. Finally, the FCC found that the transmission of CPN imposed only de minimis additional costs on IXCs who had already invested in SS7.
 
 
 20
 CPUC, AT & T and CompTel filed separate petitions for reconsideration of the First R & O. The FCC stayed the rule's effective date pending reconsideration of its proposed rules.
 
 
 21
 On May 5, 1995, the FCC issued a reconsideration order ("Second R & O"). The FCC narrowed its preemption of state public utilities blocking regulations by permitting subscribers to choose per line blocking or per call blocking on interstate calls, provided that all carriers were required to adopt a uniform method of overriding blocking on any particular call. The FCC determined that a dual blocking scheme for interstate and intrastate calls was infeasible.[11] The FCC also preempted the CPUC's regulation that nonpublished subscribers and emergency service organizations that do not make a selection would be assigned per line blocking.
 
 
 22
 In the Second R & O, the FCC adhered to its finding that the incremental cost of transmitting CPN for long distance carriers who have already installed the SS7 system was de minimis or "essentially zero." Accordingly, the FCC concluded that carriers should not be permitted to charge other carriers for the transmission of CPN. The FCC noted that the IXCs were already recovering their costs for the SS7 upgrade through charges to their long distance customers. The FCC concluded that the introduction of SS7 systems by IXCs constituted a general network upgrade with costs that should be borne by the system's general users.
 
 PART ONE
 THE PREEMPTION ORDER
 
 23
 I. The FCC's Preemption Order Is Not Arbitrary And Capricious
 
 
 24
 The CPUC challenges as arbitrary and capricious the FCC's order preempting the CPUC's rule that nonpublished subscribers, who fail to express their choice of a system to prevent disclosure of their telephone number to a called party, must receive per line blocking service. The CPUC argues that the FCC's preemption order is invalid because it has failed to demonstrate that CPUC's rule negates a valid FCC goal.
 
 
 25
 We review a federal agency's action to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law...." 5 U.S.C. § 706(2)(A). We must also decide whether the agency's decision was "contrary to constitutional right, power, privilege or immunity...." 5 U.S.C. § 706(2)(B). In carrying out our responsibility, we must determine whether the agency's decision was "a reasonable exercise of its discretion, based on consideration of relevant factors, and supported by the record." California v. FCC, 905 F.2d 1217, 1230 (9th Cir.1990). ("California I "). The Supreme Court has instructed that although "this record inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). An agency acts arbitrarily and capriciously if it "entirely failed to consider an important aspect of the problem" or "offered an explanation that runs counter to the evidence before the agency." Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). A reviewing court may overturn agency rulemaking decisions only where a "clear error of judgment" has occurred. Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).
 
 
 26
 CPUC argues that the FCC's preemption decision " 'fail[s] to consider an important aspect of the problem' " and "offer[s] an explanation for its decision that runs counter to the evidence before the agency." Motor Vehicle Mfrs. Assn., 463 U.S. at 42, 103 S.Ct. at 2866 (citation omitted). CPUC asserts that preemption of its per line blocking default rule, while allowing states to offer per line blocking for subscribers who request it, is irrational. CPUC maintains that having permitted the states to determine which blocking system will be available to its citizens, the FCC has no legitimate interest in dictating the blocking system a state assigns to nonpublished subscribers and emergency service organizations that do not communicate their choice.
 
 
 27
 The FCC responds that the fact that it narrowed its preemption in the Second R & O, to accommodate both per line and per call state blocking systems, does not prevent it from preempting CPUC's blocking default plan. We agree. We have previously held that the FCC does not relinquish its preemption power simply because it has decided to exercise it narrowly, and to defer to the states in some area of common interest. California v. FCC, 39 F.3d 919, 931-933 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1427, 131 L.Ed.2d 309 (1995) ("California III").
 
 
 28
 The FCC's explanation of its decision that the CPUC's per line blocking default rule would impede the development of CPN based services is rational. The FCC is empowered "to make reasonable assumptions about economic impact based on the evidence currently available." North Carolina Utilities Commission v. FCC, 552 F.2d 1036, 1056 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 223, 54 L.Ed.2d 154 (1977). The FCC can, in determining what regulations will best support the development of CPN for interstate calls, make a "predictive judgment" that its regulations will better serve that goal than would CPUC's default plan. American Postal Workers Union v. United States Postal Service, 891 F.2d 304, 314 (D.C.Cir.1989) (noting that "agencies are entitled to engage in predictive judgments of the future public interest and that 'complete factual support' is not required where such predictions 'necessarily involve[ ] deductions based on the expert knowledge of the agency' ") (citation omitted), rev'd on other grounds, 498 U.S. 517, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991). See also Bowman Transp., Inc., 419 U.S. at 293-294, 95 S.Ct. at 446 (stating "[i]f the Commission has 'drawn out and crystallized these competing interests [and] attempted to judge them with as much delicacy as the prospective nature of the inquiry permits,' ... we can require no more.").
 
 
 29
 The Communications Act of 1934, 47 U.S.C. §§ 151-613, separates the regulation of interstate and intrastate telecommunications. Congress determined that the FCC should "make available, so far as possible, to all the people of the United States a rapid, efficient, nationwide, and worldwide wire and radio communication service with adequate facilities at reasonable charges...." 47 U.S.C. § 151. The FCC is also charged with the mission of encouraging "the provision of new technologies and services to the public." 47 U.S.C. § 157. The Act expressly denies to the FCC any authority over intrastate communications. Section 2(b)(1) provides in pertinent part:
 
 
 30
 [N]othing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, ...
 
 
 31
 47 U.S.C. § 152(b)(1).
 
 
 32
 The Supreme Court's decision in Louisiana Public Service Commission v. FCC, 476 U.S. 355, 375, n. 4, 106 S.Ct. 1890, 1902, n. 4, 90 L.Ed.2d 369 (1986), recognized an "impossibility" exception to the limitation on the FCC's authority set forth in section 2(b)(1). The Court held that the FCC may preempt a state regulation where it is "not possible to separate the interstate and intrastate components of the asserted FCC regulation." Id. The FCC may regulate "when the state's exercise of that authority negates the exercise by the FCC of its own lawful authority over interstate communication." California I, 905 F.2d at 1243. We have concluded, however, that the impossibility exception is narrow. Id. The FCC must demonstrate that the state regulation would negate valid FCC regulatory goals. Id.
 
 
 33
 [T]he FCC bears the burden of justifying its entire preemption order by demonstrating that the order is narrowly tailored to preempt only such state regulations as would negate valid FCC regulatory goals. (emphasis in the original).
 
 
 34
 California I, 905 F.2d at 1243.
 
 
 35
 In its First R & O, the FCC stated that its goal in promoting CPN based services was to develop and make available new consumer services and choices. The most striking example of the benefits of a CPN service is that battered women or abused children have been rescued when they were unable to complete their plea for help or give their address because the emergency service dispatcher had received the calling party's number.
 
 
 36
 The FCC set forth its justification for preempting the CPUC's per line blocking default for intrastate calls in the Second R & O:
 
 
 37
 86. California's default policy thwarts and impedes our federal goals for interstate CPN-based services. Initially, to the extent California's default policy prevents the deployment of calling party number identification services in California, it deprives the residents of, and callers to, that state of access to the benefits we have determined in this proceeding are associated with such interstate services. It does this in a number of ways. First, unless carriers in California enable the lines of residents in that state to receive interstate CPN, these residents will be unable to realize the efficiencies and new service opportunities we believe will flow from interstate CPN-based services. Second, callers to California from other states also would be denied the benefits of these new services and opportunities when they made calls to businesses or residents in California. For example, callers to businesses would be subject to longer order processing times, longer credit verification processes, and more cumbersome call routing techniques. Similarly, absent number identification services, callers to residents are likely to have fewer completed calls than if they are calling residents who are able to recognize the calling party's number, and want to receive the call. The negative impact on interstate CPN policies is exacerbated because residents in California receive and transmit more interstate calling minutes than the residents of any other state. Depriving parties participating in those calls from the benefits we anticipate of the deployment of interstate CPN-based services necessarily thwarts and impedes the accomplishment of our objectives, particularly the development of interstate CPN-based services.
 
 
 38
 87. California's policy also deprives both parties on an interstate call from California of choice, an important element in our balancing of the rights and expectations of the calling and called parties. First of all, we have determined that as a matter of federal policy, the called party should have access to incoming CPN unless the calling party has exercised his right not to have his CPN revealed. While we have carefully balanced the privacy interests of the calling party with the expectation of the called party to receive CPN, California's default policy upsets this balance on an interstate call. California provides no evidence that a caller who chooses to have an unlisted or nonpublished number also wants per line blocking. It is not apparent that a customer with an unlisted number, readily available through directory assistance, would object to the passage of that same number to a called party of his choosing when he makes a telephone call. Indeed, while it appears that more than forty states offer some level of per line blocking, no other state automatically assumes callers with unlisted or nonpublished numbers want per line blocking. The record indicates that the general availability of per line blocking adversely affects the penetration of CPN-based services. Because we seek to make interstate CPN-based services widely available, we are reluctant to conclude, absent any supportive evidence, that California's assumption is correct.
 
 
 39
 As demonstrated by the above findings, the FCC's preemption rule is a "reasonable exercise of its discretion, based on consideration of relevant factors, and supported by the record." California I, 905 F.2d at 1217.
 
 
 40
 In the First R & O, the FCC established per call blocking as the national requirement for interstate calls and preempted any state that permitted per line blocking. The FCC also preempted states that authorized disclosure of the CPN with no blocking option at all. In its Second R & O, the FCC substantially narrowed the scope of its preemption order. It authorized per line blocking in states already providing that system. The FCC's preemption order precludes per line blocking default only for nonpublished subscribers and emergency service organizations that do not communicate their choice. The FCC's preemption order satisfies the requirement that a preemption rule should be narrowly tailored to fit federal policies. California III, 39 F.3d at 932. We hold that the FCC's preemption regulation is not arbitrary and capricious. We also conclude that the FCC's preemption of CPUC's default fits within the "impossibility exception" to section 2(b)(1) of the Communications Act.
 
 
 41
 II. The FCC's Preemption Order Does Not Violate The Federal Constitution
 
 
 42
 CPUC raises two federal constitutional challenges to the FCC's Caller ID rule. The FCC asserts that the CPUC lacks standing to present a constitutional challenge. The FCC also maintains that its preemption order does not invoke state action. We review constitutional questions de novo. United States v. Yacoubian, 24 F.3d 1, 3 (9th Cir.1994).
 
 
 43
 A. CPUC Has Standing To Challenge The FCC's Preemption Order
 
 
 44
 In appealing from an FCC preemption order, a state acts not merely as parens patriae, but also to vindicate its own sovereign interest in law enforcement and its subsidiary interest in creating and enforcing fair and effective public utility regulation. Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 601-602, 102 S.Ct. 3260, 3265-3266, 73 L.Ed.2d 995 (1982); Pacific Gas & Elec. Co. v. Energy Resources Conservation & Development Comm'n of California, 461 U.S. 190, 205, 103 S.Ct. 1713, 1722-1723, 75 L.Ed.2d 752 (1983). The CPUC has standing to challenge the FCC's preemption order because of its interest in regulating intrastate telecommunications services consistent with federal constitutional protections and in exercising California's sovereign powers over matters reserved to the states.
 
 
 45
 B. The CPUC's Exercise Of Its Authority Is State Action
 
 
 46
 The FCC relies on two cases for the remarkable proposition that the CPUC is not a state actor. Information Providers' Coalition v. FCC, 928 F.2d 866 (9th Cir.1991); Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co., 827 F.2d 1291 (9th Cir.1987), cert. denied, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988). Neither case supports this theory. In Information Providers' Coalition, the court held that because "carriers are private companies, not state actors," there was no constitutional restraint on the termination of telephone service to "dial-a-porn operators." Id. at 877. In Carlin Communications, Inc., the court concluded that a private telephone company was liable as a state actor under 42 U.S.C. § 1983 because a state prosecutor had directed it to prohibit transmission of the plaintiff's "adult entertainment." Id. at 1295, 1297. In this matter, the CPUC, a state agency, contends that the preemption of its per line blocking default rule has violated the federal constitution. The FCC's argument that the CPUC's exercise of its rulemaking authority is not state action is clearly frivolous.
 
 
 47
 C. The FCC's Preemption Of The CPUC Does Not Implicate Constitutional Privacy Rights
 
 
 48
 CPUC argues that the FCC's preemption of the CPUC's per line blocking default "violates the federal constitutional privacy rights of California citizens." (CPUC Brief at p. 29). CPUC has not cited any authority to support the notion that a telephone number is protected by the federal constitution. The Supreme Court has noted that "exposure of the self to others in varying degrees is a concomitant of life in a civilized society." Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Not every "exposure" raises privacy concerns under the United States Constitution. The Supreme Court has limited the constitutional right to privacy to interferences with "a person's most basic decisions about family and parenthood ... as well as bodily integrity." Planned Parenthood v. Casey, 505 U.S. 833, 849, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992). A phone number is not among the select privacy interests protected by a federal constitutional right to privacy.[12] In Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the United States Supreme Court held that there is no Fourth Amendment right to prevent the disclosure of the telephone numbers dialed from a home telephone. The Court explained:
 
 
 49
 Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes.
 
 
 50
 442 U.S. at 743, 99 S.Ct. 2577 (Fourth Amendment protections do not extend to the installation and use of a pen register to record numbers dialed from a telephone).
 
 
 51
 Relying on Smith, the highest courts in Ohio and South Carolina have ruled that there is no federal privacy right to protection from disclosure of telephone numbers via Caller ID services. Ohio Domestic Violence Network v. Public Utilities Commission of Ohio, 70 Ohio St.3d 311, 318, 638 N.E.2d 1012, 1019 (Ohio S.Ct.1994); Southern Bell Telephone and Telegraph Co. v. Hamm, 306 S.C. 70, 77-78, 409 S.E.2d 775 (1991). In Saldana v. Wyoming, 846 P.2d 604 (1993), the Wyoming Supreme Court held that there is no federal constitutional right to privacy that proscribes the disclosure of a nonpublished telephone number. Id. at 611. We conclude that the preemption rule does not violate any cognizable privacy interest.
 
 
 52
 D. The FCC's Preemption Of The CPUC Does Not Violate The First Amendment
 
 
 53
 CPUC argues that the FCC's preemption of CPUC's per line blocking default violates the First Amendment right of subscribers to remain anonymous and silent. Each of the First Amendment cases relied on by CPUC protects core political or religious speech.[13] The First Amendment protects persons from being compelled to express "adherence to an ideological point of view he finds unacceptable." Wooley v. Maynard, 430 U.S. 705, 714-715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). The government cannot require an individual to participate in the dissemination on an "ideological message." Id. Exposure of a telephone number does not violate the First Amendment right not to speak.
 
 
 54
 The argument that the Commission's preemption order violates a First Amendment right to speak anonymously is similarly devoid of merit. The CPUC's reliance on cases involving the right of anonymous political speech that have required disclosure of identity under threat of criminal and civil penalties is equally misplaced. In McIntyre v. Ohio Elections Comm'n, --- U.S. ----, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Court struck down a statute which prohibited the distribution of campaign literature. Id. at ----, 115 S.Ct. at 1524. In Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Court declared unconstitutional a statute making it a crime to distribute anonymous handbills. Id. at 64-65, 80 S.Ct. at 538-539. The Court instructed in Talley that "[t]here can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." Id. Similarly, in the third case relied on by CPUC, the California Supreme Court struck down a regulation requiring phone messages to include the name and address of the speaker because it "had the effect of restricting the dissemination of ideas." Huntley v. California PUC, 69 Cal.2d 67, 72, 69 Cal.Rptr. 605, 442 P.2d 685 (1968). Unlike the circumstances in the cited cases, the FCC's regulation does not compel disclosure of the identity of a person who exercises his or her freedom of expression. The FCC's preemption order does not violate the First Amendment right to speak anonymously.
 
 PART TWO
 THE "FREE PASSAGE" RULE
 
 55
 I. The FCC's Free Passage Rule Is Not Arbitrary And Capricious
 
 
 56
 AT & T and CompTel contend that the FCC's free passage rule is arbitrary, capricious and violates the APA. They argue that the FCC did not address highly relevant factors in determining whether to adopt a free passage rule. AT & T and CompTel claim that the FCC justified its free passage rule on the ground that it would not impose any costs or losses on IXCs. They assert that the FCC reached this conclusion by relying "solely on the fact that the IXCs' marginal costs of transporting Caller ID over previously constructed SS7 networks were de minimis." (AT & T and CompTel Opening Brief at p. 23). AT & T and CompTel assert further that the FCC ignored unrebutted evidence of potentially massive additional costs. Specifically, AT & T and CompTel assert that the FCC failed to consider the cost of the calls that will go unanswered with Caller ID. The record does not support this contention.
 
 
 57
 The record reveals that the FCC considered the potential loss of revenues that will result from unanswered calls. In finding that the IXCs would not necessarily lose revenues from unanswered calls resulting from the introduction of Caller ID, the FCC relied on evidence in the record that supports an inference that CPN transmission will increase, rather than decrease, the number of calls answered. The FCC offers in its brief the example, based on comments in the record, that a called party might recognize a long distance number as a friend's and answer a call that might otherwise have gone unanswered. The FCC found evidence in the record that the IXCs would be compensated for any de minimis costs of CPN transmission by the revenue generated by other CPN based services. For example, the record shows that the 800 and 900 number services, for which AT & T bills the called party directly, represent a substantial portion of the long distance market. The FCC received evidence that in a typical day, more than 40 percent of the 160 million calls on the AT & T network are 800 number calls.
 
 
 58
 AT & T and CompTel next assert that there is no rational connection between the facts the FCC found and its stated policy objective of fostering investment in CPN based services. They claim that the FCC found that Caller ID services were beneficial to telephone customers and would enhance the value of the local Caller ID services. AT & T and CompTel assert that the free passage rule will not encourage IXC investment in SS7 systems.
 
 
 59
 The FCC concluded that IXCs will benefit from the free passage rule because IXCs with SS7 will continue to receive CPN from LECs without additional charge to the access fees the IXCs already pay LECs. This permits IXCs to develop and market their own interstate CPN based services, such as: customized customer service (which permits a special telephone ring for selected incoming calls), voice message storage, call routing, personal communication services, and advanced intelligence network. The FCC found further that IXCs have the incentive to develop and deploy the SS7 system, irrespective of the revenues derived from CPN based services, because SS7 provides: greater network efficiencies due to quicker call set up, enhanced flexibility in call processing, and reduction in billing fraud. Contrary to AT & T and CompTel's contentions, the FCC articulated a rational connection between the facts found and its stated policy objective of fostering investment in CPN based services.
 
 
 60
 AT & T and CompTel next assert that the free passage rule is internally inconsistent because it bars IXCs from imposing charges to realize the value of their investment in SS7 upgrades, while it "allows LECs to earn additional revenues from the inclusion of interstate calls in the LECs' intrastate residential Caller ID offerings." (AT & T and CompTel Brief at p. 26). They argue such inconsistency is a "hallmark of arbitrary decisionmaking." Id. According to AT & T and CompTel, the impact of the FCC's free passage rule was to deprive them of the ability to recover for their investment in SS7 upgrades. AT & T and CompTel contend further that the FCC's determination, that the IXC investment in the SS7 system constitutes a "general network upgrade" with costs that must be recouped in general charges to be paid by all users and not in rates targeted to recipients, is contrary to prior FCC decisions. We disagree.
 
 
 61
 The FCC's free passage rule is consistent with its prior rulings that the investment in SS7 systems constitutes a general network upgrade with costs that must be recovered in general charges paid by all users. See Provision of Access for 800 Service, 6 FCC Rcd 5421, 5428 (1991) ("SS7 represents a general network upgrade, the core costs of which should be borne by all network users").
 
 
 62
 AT & T and CompTel's contention that the Second R & O permits LECs to charge its local customers for interstate Caller ID services while it bars IXCs from imposing charges on its subscribers finds no support in the record. The FCC's free passage rule does not bar IXCs from recovering their investment in SS7 from their general tariffs, greater network efficiencies, and the additional revenue IXCs can earn from marketing other CPN based services to 800 and 900 number customers. The FCC found, moreover, that it was impractical, because of the lack of relationship between IXCs and called parties, to permit the IXCs to recover fees from residential customers serviced with Caller ID. AT & T conceded in oral argument that it would have developed its SS7 system whether or not it was permitted to charge for interstate Caller ID.
 
 
 63
 Finally, AT & T and CompTel contend that the free passage rule is invalid because the FCC made no attempt to explain its departure from longstanding policies. AT & T and CompTel point to a decade of FCC decisions recognizing that telecommunications services may be priced to exceed their marginal or incremental costs--and must in aggregate recover the fully distributed or average costs. Thus, AT & T and CompTel assert that the FCC's focus on incremental rather than aggregate costs in this matter reflects a change in policy.
 
 
 64
 The FCC's free passage rule is not a departure from prior FCC decisions or policies. The FCC found that the cost of transporting CPN over completed SS7 systems was de minimis and that the IXCs were already recovering their investment in SS7. AT & T and CompTel have not demonstrated that there is an FCC policy permitting telecommunications companies to charge separately for a transmission whose costs are zero or de minimis.
 
 
 65
 We conclude that the FCC's free passage rule is not arbitrary and capricious and does not violate the requirements of section 10(e) of the APA. 5 U.S.C. § 706.
 
 
 66
 II. The FCC's Free Passage Rule Does Not Violate The Communications Act
 
 
 67
 AT & T and CompTel assert further that the FCC's order violates the ratesetting provisions of the Communications Act that require the FCC to make findings that an existing rate was unjust and unreasonable, or constituted unreasonable discrimination, prior to the imposition of a new rate.[14] AT & T and CompTel argue that the fact that the free passage rule prohibits IXCs from imposing charges on LECs for the interstate transmission of CPN has the practical effect of barring IXCs from seeking a change in their rates.
 
 
 68
 The FCC responds that the Second R & O did not constitute ratemaking pursuant to section 205, but rather its action was rulemaking pursuant to section 154(i) and (j).[15] An agency's interpretation of a statutory provision or regulation it is charged with administering is entitled to a high degree of deference. Providence Hosp. of Toppenish v. Shalala, 52 F.3d 213, 216 (9th Cir.1995).
 
 
 69
 AT & T and CompTel base their argument that the FCC impermissibly engaged in ratemaking on a series of cases that hold that "the actual impact of agency action and not its form is decisive." E.g., AT & T v. FCC, 487 F.2d 865, 874 (2d Cir.1973) ("Special Permission" case).[16] These cases do not support their argument. In the Special Permission case, the Second Circuit struck down an FCC order denying AT & T special permission to file a tariff revising existing rates. The court held that the FCC's action interfered with the "careful accommodation of [ratepayer and carrier] interests" underlying the ratemaking provisions of the Communications Act. Id. at 873. In the instant case, no IXC has filed a CPN transport tariff. None has been prevented from doing so. The FCC does not act pursuant to section 205 until a tariff has been filed. PUC of California v. FCC, 356 F.2d 236 (9th Cir.), cert. denied, 385 U.S. 816, 87 S.Ct. 35, 17 L.Ed.2d 54 (1966).
 
 
 70
 No complaint has been filed with the FCC, nor has the FCC issued "an order for investigation and hearing made on its own initiative" regarding tariffs or charges filed by any IXC. Thus, the requirements of section 205 have not been violated. "Time and again, '[t]he court has recognized that even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration.' " Mobil Oil Exploration & Producing S.E., Inc. v. United Dist. Cos., 498 U.S. 211, 228, 111 S.Ct. 615, 626, 112 L.Ed.2d 636 (1991) (citation omitted). The FCC is entitled to define what constitutes a reasonable policy in terms of the underlying goals of the Communications Act, and to use rulemaking as part of the process of developing and implementing those policies. National Association of Regulatory Utility Commissioners v. FCC, 737 F.2d 1095, 1120 (D.C.Cir.1984) (the FCC may use rulemaking to develop policies for interstate communications markets, including policies that affect rates), cert. denied, 469 U.S. 1227, 105 S.Ct. 1224, 1225, 84 L.Ed.2d 364 (1985). Moreover, we must review these determinations deferentially. Providence Hosp. of Toppenish, 52 F.3d at 216. Thus, because the FCC did not impermissibly engage in rate making without following the required procedures, we reject AT & T and CompTel's argument that the FCC violated section 205 of the Communications Act.
 
 CONCLUSION
 
 71
 We conclude that the FCC did not act arbitrarily and capriciously, or contrary to law, in ruling (1) that the preemption of the CPUC's rule was necessary to prevent negation of a valid FCC regulatory goal, and (2) that mandating the imposition of the per call blocking option on subscribers with nonpublished numbers and emergency service organizations that do not make a choice between blocking options does not violate any federal constitutional right. We also uphold the FCC's free passage rule because the record shows that the FCC examined the relevant evidence and adequately explained all aspects of its decision.
 
 
 72
 The petitions for review are DENIED.
 
 
 
 *
 Honorable Robert H. Whaley, United States District Judge, for the Eastern District of Washington, sitting by designation
 
 
 [1]
 Nonpublished refers to both unlisted telephone numbers (which are available from directory assistance) and unpublished telephone numbers (which are both unlisted and not available from directory assistance)
 
 
 [2]
 Default is a term of art used by the parties in this case to refer to the assignment of a blocking system to a subscriber who does not respond to a request that a choice be made between per line blocking and per call blocking
 
 
 [3]
 Common Channel Signalling System 7 refers to a technological advancement in the method that telephone calls are set up (i.e., how a connection is established). Prior to the development of SS7 signalling systems, calls were set up over the communications channels that also carried the conversations once connections were completed. This is referred to as "in-band signalling," in that the call set up and related signalling were performed in the same frequency bands as the ultimate calls and were an expensive prelude to those calls. The SS7 system permits "out of band" signalling to occur, i.e., it allows calls to be set up over a separate set of systems and switches that do not tie up communications channels. SS7 permits telephone companies to carry and transmit CPN, and to offer a host of other new services that include: pay-per-view television, order entry verification, voice message storage, secure computer access, customized customer service, business fraud reduction, call routing, and emergency dispatch
 
 
 [4]
 Pacific Bell and GTE California have intervened and submitted a brief in support of the FCC responding to CPUC's petition. Toward Utility Rate Normalization ("TURN"), Consumer Action ("CA"), Consumer Federation of America ("CFA"), Southern California Coalition on Battered Women ("SCCBW"), the National Association of Regulatory Utility Commissioners ("NARUC"), the National Association of Social Workers ("NASW"), Pennsylvania Public Utility Commission ("PPUC"), and California Alliance Against Domestic Violence & the Family Violence Prevention Fund ("CAADC") have intervened and submitted a joint brief in support of CPUC. Ameritech Operating Companies, Bell Atlantic Telephone Companies, BellSouth Telecommunications, Inc., GTE Service Corporation, National Telephone Cooperative Association, Southwestern Bell Telephone Company, United States Telephone Association, and US West Communications, Inc. (collectively "Network Intervenors") have intervened and submitted a brief in support of the FCC and in response to AT & T's and CompTel's petition
 
 
 [5]
 Under the Communications Act of 1934, state utilities, such as the CPUC, have authority over intrastate common carrier communications by wire or radio. The FCC has authority over interstate common carrier communications by wire or radio. 47 U.S.C. §§ 152(a) & 152(b)
 
 
 [6]
 The calling party's number appears on a device that is attached to, or incorporated into, the called party's telephone
 
 
 [7]
 The customer notice and education program will include: the establishment of a 24-hour toll free number for consumer information, a consumer education campaign, and ordering inserts to accompany telephone bills
 
 
 [8]
 Rules and Policies Regarding Calling Number Identification--Caller ID, Notice of Proposed Rulemaking, 6 FCC Rcd 6752 (1991)
 
 
 [9]
 Calling party refers to the person initiating a call. Called party refers to the person receiving the call
 
 
 [10]
 Blocking options refer to the methods available to a calling party to prevent the disclosure of his or her telephone number. When a telephone number is blocked, the transmission of the telephone call is accompanied by a privacy indicator that prevents the disclosure of the calling party's number to the called party. The same SS7 protocol, and the same facilities are used to pass CPN to the called party, whether the call is interstate or intrastate. Thus, default per line blocking would affect both intrastate and interstate calls
 
 
 [11]
 In its opening brief, CPUC did not challenge the FCC's finding that it was infeasible to offer separate blocking schemes for interstate and intrastate calls, therefore we need not discuss this factor
 
 
 [12]
 See, e.g., Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965) (upholding married couple's right to use contraceptives); Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (invoking the "sanctity of the family" and striking down, on privacy grounds, ordinance limiting right of certain relatives to occupy the same dwelling); Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967) (striking down law prohibiting persons of different races from marrying); Skinner v. Oklahoma, 316 U.S. 535, 543, 62 S.Ct. 1110, 1113-1114, 86 L.Ed. 1655 (1942) (striking down law requiring sterilization of certain felons)
 
 
 [13]
 The CPUC relies on Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977); Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 258, 94 S.Ct. 2831, 2839-2840, 41 L.Ed.2d 730 (1974); West Virginia Board of Education v. Barnette 319 U.S. 624, 633-634, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943)
 
 
 [14]
 47 U.S.C. § 205 provides in pertinent part:
 Whenever, after full opportunity for hearing, upon a complaint or under an order for investigation and hearing made by the Commission on its own initiative, the Commission shall be of the opinion that any charge ... is or will be in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge....
 
 
 [15]
 47 U.S.C. § 154(i) authorizes the FCC to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." Section 154(j) provides in pertinent part that: "[t]he Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice."
 
 
 [16]
 The following cases are also cited by AT & T and CompTel: AT & T v. FCC, 449 F.2d 439 (2d Cir.1971); MCI Telecommunications Corp. v. FCC, 561 F.2d 365 (D.C.Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 780, 781, 54 L.Ed.2d 790 (1978); New York Tel. Co. v. FCC, 631 F.2d 1059 (2d Cir.1980); and North Carolina Utilities Commission v. FCC, 552 F.2d 1036 (4th Cir.1977), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 223, 54 L.Ed.2d 154 (1977)